United States Court of Appeals,

Eleventh Circuit.

No. 95-5534.

Francis MONTOUTE, Plaintiff-Appellee,

v.

Steven John CARR, Defendant-Appellant.

June 10, 1997.

Appeal from the United States District Court for the Southern District of Florida. (No. 94-14180-CV-KLR), Kenneth L. Ryskamp, Judge.

Before CARNES, Circuit Judge, and CLARK and CAMPBELL[*], Senior Circuit Judges.

CARNES, Circuit Judge:

Police officer Steven Carr shot Francis Montoute in the buttock in order to apprehend him. Montoute filed a 42 U.S.C. § 1983 lawsuit against Carr and others alleging that Carr had violated Montoute's constitutional rights by using excessive force to arrest him. After the district court denied Carr's qualified immunity issue summary judgment motion, Carr brought this interlocutory appeal. Agreeing with his contention that he is entitled to qualified immunity, we reverse.

## I. BACKGROUND FACTS AND PROCEDURAL HISTORY

In reviewing *de novo* a defendant's summary judgment motion, we are required to view the facts, which are drawn from the pleadings, affidavits, and depositions, in the light most favorable to the plaintiff. *Swint v. City of Wadley,* 51 F.3d 988, 992 (11th Cir.1995). As such, what we state as "facts" in this opinion for purposes of reviewing the rulings on the summary judgment motion may not be the actual facts. Nonetheless, they are the facts for the present purposes, and we set them out below. *Id.*

In the early morning hours of April 11, 1993, a boisterous crowd of approximately one hundred people had gathered in front of a bar on Lemon Street in Sebring, Florida. After the city police department received several "911" calls reporting fights and gunfire, a team of on-duty,

[*]Honorable Levin H. Campbell, Senior U.S. Circuit Judge for the First Circuit, sitting by designation.

uniformed officers were dispatched. One of the officers was Sergeant Steven Carr.

After arriving at the scene and while standing on Lemon Street, Sergeant Carr heard a gunshot. What he heard was the discharge of a shotgun on that very street. Carr then spotted Montoute, walking or running towards Carr with a 12-gauge, pistol-grip, sawed-off, pump shotgun in his right hand; it was pointing towards the ground. Possession of a sawed-off shotgun is a felony in Florida. *See* Fla. Stat. Ann. § 790.221 (West 1992). As he approached Carr, Montoute said, "Don't shoot me, Officer. I on your side, man. I just take the gun from the guy."[1]

Sergeant Carr and another officer repeatedly ordered Montoute to drop the sawed-off shotgun. It is undisputed that Montoute heard those orders but refused to comply. Without giving the officers any explanation for his refusal to comply with their lawful orders, Montoute proceeded on with the sawed-off shotgun in his hand.[2] He walked or ran past Sergeant Carr, and once past Carr he began running away. He ran down an alley and onto Highlands Street, a street which runs perpendicular to Lemon Street. In other words, shotgun in hand, Montoute was running away from the crowd on Lemon Street. Carr, who was also on foot, was in hot pursuit. Carr fired one shot from his service revolver at Montoute, but missed. After the first shot, Montoute continued running down Highlands Street towards a parked car. Carr fired a second shot, this time striking Montoute in the left buttock. After he had gone past Carr, Montoute had never turned around to face Carr and had never pointed the shotgun at anyone.[3]

---

[1]Montoute's story, which we accept as true for present purposes, is that before he fired the shotgun he had taken it away from some fighting youths, put two shells into it, and fired it once into the air. However, there is no evidence that Sergeant Carr knew any of that. Instead, the evidence is that moments after hearing a shotgun blast Carr saw Montoute leaving the scene with a sawed-off shotgun in his hand.

[2]At his deposition, Montoute first said that he did not give up the shotgun because the officer had a gun on him, and "I think maybe he kill me too." Later in his deposition, Montoute said that he did not drop the shotgun as ordered by the officers, because if he had done so the youths from whom he had gotten the weapon would have taken it back. He conceded, however, that he came within five or six feet of an officer and he did not explain why he did not simply hand the shotgun to the officers or drop it at their feet. More importantly for present purposes, even if Montoute's post-hoc explanation is accepted as true, the fact remains that he never attempted to communicate that explanation, or any other one, to the officers.

[3]Sergeant Carr stated to the contrary in his affidavit, but we take the evidence in the light most favorable to Montoute.

Montoute filed a 42 U.S.C. § 1983 lawsuit against Sergeant Carr and another defendant alleging that Carr had used excessive force to arrest him, and had thereby violated his Fourth Amendment right to be free from unreasonable searches and seizures. Carr raised the defense of qualified immunity and filed a motion for summary judgment. The district court denied Carr's motion, stating that there were disputed issues of material fact regarding whether Montoute had ever turned to face Carr. The court concluded that if Montoute had his back turned and was running towards away, "it is questionable as to whether defendant Carr could reasonably believe that [Montoute] posed a serious threat to him or others." Carr then filed this interlocutory appeal.

## II. INTERLOCUTORY JURISDICTION AND STANDARD OF REVIEW

We have interlocutory jurisdiction over issues of law that form the basis for a denial of summary judgment on qualified immunity grounds. *See Behrens v. Pelletier,* --- U.S. ----, ----, 116 S.Ct. 834, 839, 133 L.Ed.2d 773 (1996); *Cottrell v. Caldwell,* 85 F.3d 1480, 1484 (11th Cir.1996). Such an issue of law is presented in this case, and as with all legal issues, we review the district court's decision of it *de novo. See Swint,* 51 F.3d at 994.

## III. ANALYSIS

### A. The Qualified Immunity Standard

On April 11, 1993, the date Sergeant Carr shot Montoute, the law regarding the use of excessive force to apprehend fleeing suspects was clearly established. The Supreme Court had held that an excessive force claim against a law enforcement officer must be analyzed under the Fourth Amendment and its reasonableness standard. *Graham v. Connor,* 490 U.S. 386, 395, 109 S.Ct. 1865, 1871, 104 L.Ed.2d 443 (1989). The reasonableness inquiry in a Fourth Amendment excessive force case is an objective one. The question is whether the officer's actions are objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation. *Id.* at 397, 109 S.Ct. at 1872.

Because possession of a sawed-off shotgun is a felony under Florida law, and Montoute concedes he was holding one as he fled, he was unquestionably a fleeing felon suspect. At least with regard to fleeing felon suspects, the Supreme Court held eight years before this case arose that it is

not unconstitutional to use deadly force in order to prevent escape "[w]here the officer has probable cause to believe that the suspect poses a threat of serious physical injury, either to the officer or to others." *Tennessee v. Garner,* 471 U.S. 1, 11, 105 S.Ct. 1694, 1701, 85 L.Ed.2d 1 (1985). "Thus, if the suspect threatens the officer with a weapon or there is reason to believe that the suspect had committed a crime involving infliction of serious physical harm, deadly force may be used if necessary to prevent escape, and, if, where feasible, some warning has been given." *Id.* at 12, 105 S.Ct. at 1701. That standard applies when deciding the merits of such claims. A different standard applies for qualified immunity purposes.

In order to be entitled to qualified immunity from a Fourth Amendment claim, an officer need not have actual probable cause but only "arguable probable cause," i.e., the facts and circumstances must be such that the officer reasonably could have believed that probable cause existed. *See Williamson v. Mills,* 65 F.3d 155, 158 (11th Cir.1995) ("to enjoy qualified immunity [the officer] need only have had *arguable* probable cause"); *Pickens v. Hollowell,* 59 F.3d 1203, 1206 (11th Cir.1995) ("the appropriate inquiry for qualified immunity is ... whether there was arguable probable cause"); *Swint,* 51 F.3d at 996 ("[w]hen a law enforcement officer seeks summary judgment on the basis of qualified immunity, we must only ask whether ... there was arguable probable cause."); *Eubanks v. Gerwen,* 40 F.3d 1157, 1160 (11th Cir.1994)("In the case involving a warrantless search and seizure, ... whether qualified immunity ... exist[s] turns upon whether there was "arguable' probable cause....").

We have repeatedly held that because only arguable probable cause is required, the inquiry is not whether probable cause actually existed, but instead whether an officer reasonably could have believed that probable cause existed, in light of the information the officer possessed. *See, e.g., Hunter v. Bryant,* 502 U.S. 224, 228, 112 S.Ct. 534, 537, 116 L.Ed.2d 589 (1991) (holding that secret service officers were entitled to qualified immunity "if a reasonable officer could have believed that probable cause existed to arrest [the plaintiff]"); *Eubanks,* 40 F.3d at 1160 (holding that the standard for arguable probable cause is "whether a reasonable officer ... *could* have reasonably believed that probable cause existed...."). "Even law enforcement officials who

reasonably but mistakenly conclude that probable cause is present are entitled to immunity." *Hunter,* 502 U.S. at 227, 112 S.Ct. at 536 (quoting *Anderson v. Creighton,* 483 U.S. 635, 641, 107 S.Ct. 3034, 3040, 97 L.Ed.2d 523 (1987)) (internal quotations marks omitted).  Thus, the qualified immunity standard is broad enough to cover some "mistaken judgment," and it shields from liability "all but the plainly incompetent or those who knowingly violate the law."  *Malley v. Briggs,* 475 U.S. 335, 343, 106 S.Ct. 1092, 1097, 1096, 89 L.Ed.2d 271 (1986).

One additional point about the applicable law needs to be made.  Once an officer or official has raised the defense of qualified immunity, the burden of persuasion as to that issue is on the plaintiff.  *See, e.g., Suissa v. Fulton County,* 74 F.3d 266, 269 (11th Cir.1996);  *Barnette v. Folmar,* 64 F.3d 598, 600 (11th Cir.1995);  *Lassiter v. Alabama A & M Univ.,* 28 F.3d 1146, 1150 n. 3 (11th Cir.1994).  That means the question is whether Montoute has convinced us that at the time Carr shot him no officer reasonably could have believed that Montoute either (1) had committed a crime involving the infliction of serious physical harm, or (2) posed a risk of serious physical injury to Carr or others as he fled.

## B. Application of the Standard to the Facts

We need not decide whether Montoute has established that no officer reasonably could have believed that Montoute, when shot, had already committed a crime involving the infliction of serious physical harm.  That question addresses one of two alternative grounds for the use of deadly force. The other basis provides a clearer foundation for decision in this case.  Montoute has failed to convince us that no officer reasonably could have believed that he posed a risk of serious physical injury to Sergeant Carr or others, as he fled with the sawed-off shotgun in hand.

Counsel for Montoute conceded at oral argument that if Carr had shot Montoute as he was approaching him, Carr would be entitled to qualified immunity.  In other words, Montoute concedes that an officer reasonably could have believed that he presented a risk of serious physical harm until the time he passed where Carr was standing.  Nonetheless, Montoute argues that once he passed where Carr was standing and was running away, no officer reasonably could have believed that Montoute continued to pose such a risk.  We are not convinced that the danger Montoute posed

vanished in a matter of a few steps. More to the point, an officer in those circumstances reasonably could have believed that the danger Montoute presented did not end after he passed Carr.

We accept for the present purposes that once past Sergeant Carr Montoute never turned to face him again, and Montoute never actually pointed the sawed-off shotgun at anyone. But there was nothing to prevent him from doing either, or both, in a split second. At least where orders to drop the weapon have gone unheeded, an officer is not required to wait until an armed and dangerous felon has drawn a bead on the officer or others before using deadly force. Sergeant Carr faced a situation fraught with danger. Montoute had fired an illegal weapon while in a crowd of people in a near-riot situation. He was armed with a 12-gauge, pistol-grip, sawed-off, pump shotgun. Such weapons are specifically designed or altered, and frequently used, by criminals to kill people, which is why the possession of such weapons is a felony in many states, including Florida. Any officer would know that, and would know that pump shotguns can carry and fire more than one round. Therefore, an officer reasonably could have believed the pistol-grip, 12-gauge, sawed-off shotgun Montoute carried was still loaded, as it actually was. Montoute's unexplained refusal to obey the repeated orders to drop the sawed-off shotgun provided an additional basis for inferring that he presented a risk of serious physical injury to an officer or someone else.[4]

In view of all of the facts, we cannot say that an officer in those volatile circumstances could not reasonably have believed that Montoute might wheel around and fire his shotgun again, or might take cover behind a parked automobile or the side of a building and shoot at the officers or others. Indeed, if the officers had allowed Montoute to take cover, or perhaps circle back around to the crowd, he could have posed even more danger than when he had presented a clear target as he approached them. Recall that even Montoute concedes that Sergeant Carr would have been protected by qualified immunity if he had shot Montoute as he approached the officers. Under the

---

[4]Sergeant Carr recognized Montoute as someone who lived in Sebring, but that fact does not lessen the danger Montoute posed. Montoute testified that he frequently broke up fights, and one of his witnesses testified that he (that witness) had never known Montoute to be violent. There is no evidence that Sergeant Carr was aware of Montoute's peacemaking behavior on prior occasions, nor do we believe that it would make any difference in our analysis if he had been aware of it. Peacemakers usually do not carry 12-gauge, sawed-off, pump shotguns, and a person can be killed by a fleeing felon suspect who previously had a good reputation.

circumstances, Carr is no less entitled to qualified immunity because he shot Montoute later instead of sooner.

Our decision in this case is consistent with the holding in *Harrell v. Decatur County,* 41 F.3d 1494 (11th Cir.1995) *vacating and adopting dissent in* 22 F.3d 1570 (11th Cir.1994). In that case, we upheld qualified immunity where a law enforcement officer shot and killed a felony suspect, because the officer reasonably could have believed the suspect was reaching under the seat of the automobile for a weapon. 22 F.3d at 1580-81. If qualified immunity applies in those circumstances, as we held in *Harrell,* it applies where the felony suspect already had a dangerous weapon in hand and refused to drop it.

## IV. CONCLUSION

To defeat Sergeant Carr's qualified immunity defense, Montoute had the burden of establishing that under the circumstances no reasonable officer could have believed that Montoute posed a risk of serious physical injury to Carr or others. He failed to carry that burden. Accordingly, we REVERSE the district court's denial of summary judgment on qualified immunity grounds and REMAND for proceedings consistent with this opinion.