[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 00-14380

_____

FILED
U.S. COURT OF
APPEALS
ELEVENTH CIRCUIT
AUGUST 31, 2001
THOMAS K. KAHN
CLERK

D. C. Docket No. 99-00006-CV-JTC-3

JERRY CHARLES VAUGHAN,

Plaintiff-Appellant,

versus

FRED LAWRENCE COX, OFFICER, individually
and in his official capacity as an officer of the
Coweta County Sheriff's Department,
COWETA COUNTY, GEORGIA, et al.,

Defendants-Appellees.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(August 31, 2001)

Before CARNES, COX and NOONAN\*, Circuit Judges.

COX, Circuit Judge:

_____

\*        Honorable John T. Noonan, Jr., U.S. Circuit Judge for the Ninth Circuit, sitting by
designation.

Jerry Charles Vaughan appeals the district court's order granting summary judgment in favor of Deputy Fred Lawrence Cox, Coweta County, Georgia, and Coweta County Sheriff Mike Yeager on Vaughan's 42 U.S.C. § 1983 claims related to injuries he suffered during a police chase. We affirm in part and vacate and remand in part.

## *Background*[1]

In the early morning of January 5, 1998, the Sheriff's Department of Coweta County, Georgia received a report that a red pickup truck with a silver tool box in its bed had been stolen from a service station along I-85 south of Atlanta. The report included the information that the suspect, a white male wearing a white t-shirt, was believed to be heading north on I-85. In response to the report, Deputy Cox and Deputy Jeff Looney headed to the northbound lanes of I-85 in separate vehicles. Deputy Looney pulled onto the grass median to observe passing traffic. Deputy Cox continued farther north and stopped at the sight of a recent accident. Deputy Looney soon spotted a truck traveling northward that matched the description of the stolen vehicle but, contrary to the report, was towing a trailer loaded with two personal watercraft. Looney reported his sighting on his radio and began to follow the truck.

---

[1] There are several important disputes between the parties as to what transpired in the period prior to the shooting. As is our obligation at the summary judgment stage, we will resolve all disputes in favor of Vaughan's version of events.

2

After hearing Looney's report of his observation, Deputy Cox radioed Looney to inform him that there was an accident scene north of his position and that he should not attempt to stop the vehicle until it had passed by the accident.

As the red pickup and Deputy Looney passed him, Deputy Cox pulled out and joined the pursuit. While tracking the truck, the deputies made efforts to determine whether the vehicle was indeed the stolen truck. To this end, Deputy Cox sped up and passed the truck, which was proceeding at or near the speed limit. He observed two men in the cab. The man in the passenger's seat, Mr. Vaughan, matched the description of the suspect. Cox's suspicions confirmed, he and Deputy Looney decided to use a "rolling roadblock" to stop the vehicle, which involves officers blocking a suspect vehicle with their police cars and reducing speed, in the hope that the suspect car will slow down as well. Deputy Looney positioned his cruiser directly behind the pickup. Deputy Cox moved in front of the truck. Vaughan has conceded that by this point the deputies had made it clear that they desired to stop the pickup. As soon as he had positioned his vehicle in front of the truck, Deputy Cox applied his brakes. The truck rammed into the back of Cox's cruiser. Deputy Cox has testified that the impact caused him to momentarily lose control; Vaughan and the pickup's driver, Freddy Rayson, however, contend that the impact was both accidental and insufficient to cause Cox to lose control.

Rayson did not pull over following the collision, but instead accelerated while staying in the same lane of traffic.[2] Deputy Cox decided to reposition his vehicle behind the truck. He unholstered his sidearm and rolled down the passenger side window. Cox testified that he readied himself in this manner in case Rayson made aggressive moves in his direction. Cox then shifted his cruiser one lane to the left and slowed to allow the truck to pass by him. As soon as his cruiser was even with the pickup, Deputy Cox turned on his rooftop lights. Rayson responded by accelerating to eighty or eighty-five miles per hour. Cox then fired three rounds into the truck. It is undisputed that Deputy Cox did not warn the truck's occupants before he used his weapon. Cox testified that he fired because the pickup swerved as if to smash into his cruiser. Vaughan maintains that the truck, while increasing its speed, made no motion in the direction of Cox's vehicle and the shooting was unprovoked.

Deputy Cox's plan was to disable either the truck or Rayson so that he could force the truck off the road. However, his volley disabled neither the truck nor Rayson. The third bullet fired from Cox's weapon instead punctured Vaughan's spine, paralyzing him instantly below the chest. Rayson's only reaction to the

---

[2]    On cross-examination, Vaughan conceded that Rayson began to drive "recklessly" after the collision with Cox's vehicle. However, Vaughan maintains that while Rayson did accelerate, he did not change lanes or weave in and out of traffic.

shooting was to drive faster and more recklessly.[3] As the chase continued into more heavily congested sections of the highway, Cox made several more attempts to stop the vehicle, firing his weapon once more. After an extended chase, the pickup struck the cement median and came to a stop. Vaughan was removed from the truck and taken to a hospital.

Vaughan filed suit for damages pursuant to 42 U.S.C. § 1983 in the Northern District of Georgia against Deputy Cox in his individual and official capacities, Coweta County, and Coweta County Sheriff Mike Yeager in his official capacity. Vaughan's complaint alleges that: (1) Deputy Cox violated one or more of the Fourth, Fifth, Eighth, and Fourteenth Amendments in using excessive force in his attempt to stop the pickup; (2) Sheriff Yeager promulgated and established policies that caused Deputy Cox to violate Vaughan's rights; and (3) Cox's actions also constituted "negligence, assault and battery, false arrest, intentional infliction of emotional distress[,] and outrageous conduct" under Georgia law. (R.1-1 at 6.) The defendants moved for summary judgment. In analyzing Vaughan's federal claims, the court first determined that since Vaughan alleged that Cox used excessive force, a Fourth Amendment analysis should be applied. The district court thereafter found that: (1)

---

[3] After the shooting, Rayson began a desperate break for freedom which involved weaving in and out of lanes, driving at highway speeds through exit ramps, and dragging at least one of the watercraft, which had fallen off the trailer, along the ground.

Vaughan was not "seized" within the meaning of the Fourth Amendment by Cox's bullet; and (2) even if Vaughan had been seized by the bullet that hit him in the spine, the use of force was reasonable given the circumstances. Because it found that no constitutional violation had occurred, the court granted the defendants summary judgment and declined to exercise supplemental jurisdiction over the state law claims.[4] Vaughan appeals.

*Issues on Appeal*

Vaughan argues on appeal that: (1) the district court erred in finding that he was not seized when shot by Deputy Cox; (2) issues of fact remain as to whether Cox's actions were objectively reasonable; and (3) even assuming that no seizure occurred, he still has a valid Fourteenth Amendment substantive due process claim based on Cox's deliberately indifferent and conscience-shocking conduct. We review a district court's grant of summary judgment de novo, drawing all inferences in favor of the nonmoving party. *See Korman v. HBC Fla., Inc.*, 182 F.3d 1291, 1293 (11th Cir. 1999). We will address each of the issues raised by Vaughan in turn.

---

[4]    Vaughan has raised no arguments on appeal regarding the district court's decision not to exercise jurisdiction over his state law claims.

*Discussion*

The first step in reviewing an excessive force claim is to determine whether the plaintiff was subject to the "intentional acquisition of physical control" by a government actor. *Brower v. County of Inyo*, 489 U.S. 593, 596, 109 S. Ct. 1378, 1381 (1989). It is clear that "apprehension by the use of deadly force is a seizure . . . ." *Tennessee v. Garner*, 471 U.S. 1, 7, 105 S. Ct. 1694, 1699 (1985). It is also apparent that Vaughan could have been "seized" for Fourth Amendment purposes even though he was not taken into custody immediately following the shooting. As the Supreme Court has noted, "the application of physical force to restrain movement, even when it is ultimately unsuccessful" is sufficient to constitute a seizure. *California v. Hodari D*, 499 U.S. 621, 626, 111 S. Ct. 1547, 1550 (1991). Undeniably, Cox's firing of his weapon was an application of force with the design to restrain movement. It is therefore irrelevant that Vaughan was not actually taken into custody until after the lengthy chase. However, the Supreme Court has held that a seizure occurs "only when there is a governmental termination of freedom of movement *through means intentionally applied*." *Brower*, 489 U.S. at 597, 109 S. Ct. at 1381 (emphasis in original). The question remains whether Cox's action in firing his weapon at the truck can be deemed "means intentionally applied" to seize Vaughan.

7

The district court concluded, and Deputy Cox contends here, that Vaughan was not seized by the bullet because Cox did not intend to hit Vaughan when he fired his pistol. Instead, Cox planned to seize both Rayson and Vaughan by disabling the truck or Rayson with a volley of bullets and then ramming the pickup off the road. Cox argues that Vaughan was not seized because Cox, while intending to apprehend Vaughan, did not intend to stop him by shooting him.[5] In Deputy Cox's view, a seizure can only occur when an officer stops a suspect using the specific means that he intended. Because Cox did not intend to shoot Vaughan, he contends that Vaughan did not suffer a Fourth Amendment seizure. We disagree.

The Supreme Court has cautioned against a too finely drawn reading of "means intentionally applied." *Brower*, 489 U.S. at 598, 109 S. Ct. at 1382. It is not necessary for the means by which a suspect is seized to conform exactly to the means intended by the officer. Otherwise courts could be compelled to conclude that "one is not seized who has been stopped by the accidental discharge of a gun with which

---

[5] In support of this position, Deputy Cox cites several cases from our sister circuits where courts rejected Fourth Amendment claims brought by innocent bystanders or hostages accidentally harmed by police fire. *See Rucker v. Harford County*, 946 F.2d 278 (4th Cir. 1991) (bystander not seized by police bullet aimed at fleeing vehicle); *Childress v. City of Arapaho*, 210 F.3d 1154 (10th Cir. 2000) (hostage wounded by police bullet aimed at suspect not seized); *Medeiros v. O'Connell*, 150 F.3d 164 (2nd Cir. 1998) (same); *Landol-Rivera v. Cruz Cosme*, 906 F.2d 791 (1st Cir. 1990) (same). These cases are of little aid to our inquiry, however, because Vaughan was neither an innocent bystander nor a hostage; instead, he was a suspect whom Deputy Cox sought to apprehend.

8

he was meant only to be bludgeoned, or by a bullet in the heart that was meant only for the leg." *Id.* at 598-99, 109 S. Ct. at 1382. Instead, the Court has held that it is enough "that a person be stopped by the very instrumentality set in motion or put in place in order to achieve that result." *Id.* That standard has been met in this case. Cox fired his weapon to stop Vaughan and Rayson; Vaughan was struck by one of those bullets. Because Vaughan was hit by a bullet that was meant to stop him, he was subject to a Fourth Amendment seizure. We therefore must turn to the question of whether the seizure could be found "unreasonable."

A police officer may use deadly force to seize a fleeing felony[6] suspect when the officer: (1) "has probable cause to believe that the suspect poses a threat of serious physical harm, either to the officer or to others" or "that he has committed a crime involving the infliction or threatened infliction of serious physical harm;" (2) reasonably believes that the use of deadly force was necessary to prevent escape; *and* (3) has given some warning about the possible use of deadly force, if feasible. *Garner*, 471 U.S. at 11-12, 105 S. Ct. at 1701; *Acoff v. Abston*, 762 F.2d 1543, 1547 (11th Cir. 1985). We review an officer's use of force "from the perspective of a reasonable officer on the scene," taking care to make allowances "for the fact that police officers are often forced to make split-second judgments – in circumstances that

_____

[6] There is no dispute that Vaughan was a suspect in at least one felony.

9

are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 490 U.S. 386, 396-97, 109 S. Ct. 1865, 1872 (1989). It is undisputed that Deputy Cox had no reason to believe that Vaughan or Rayson had committed a crime involving the infliction or threatened infliction of physical harm. Therefore, our inquiry is limited to whether a reasonable officer: (1) would have had probable cause to believe that the Vaughan and Rayson's unabated flight posed an immediate threat of serious harm to Deputy Cox, other police officers, or innocent motorists; (2) would have believed that deadly force was necessary to stop the suspects; and (3) would have concluded that it was not feasible to warn the suspects of the possible use of deadly force. *See Acoff*, 762 F.2d at 1547.

Resolving all evidentiary disputes in Vaughan's favor, we conclude that a reasonable jury could find that Deputy Cox acted unreasonably in firing at the pickup. First, material issues of fact remain as to whether Vaughan and Rayson's continued escape presented an immediate threat of serious harm to Cox or others. Assuming Vaughan's version of events, it is not clear that Looney or Cox were in immediate danger from the suspects at the time of the shooting, nor does the record reflect that the suspects had or were likely to menace other innocent drivers.[7] What Deputy Cox

---

[7]    According to Vaughan, the pick-up's lane was clear of traffic and Rayson made no moves to change lanes before Cox fired.

10

was faced with at the time he fired his weapon was simply two suspects who were evading arrest and had accelerated to eighty or eighty-five miles per hour in an attempt to avoid capture. Under such facts, a reasonable jury could find that Vaughan and Rayson's escape did not present an immediate threat of serious harm to Cox or others on the road.[8]

---

[8] In support of his position, Cox cites three cases from our sister circuits in which courts found the application of deadly force in a high-speed chase to be reasonable as a matter of law. However, the facts of the cited cases diverge significantly from the case at bar. In *Smith v. Freland*, 954 F.2d 343 (6th Cir. 1992), a suspect led an officer on a "wild chase at speeds in excess of ninety miles per hour," attempted to ram the officer's car twice, and drove around a police blockade at high speed in an effort to avoid arrest. 954 F.2d at 344. The officer eventually cornered the suspect in a dead-end street, blocking the suspect's vehicle with his police car. *See id.* After the officer exited his vehicle to make an arrest, the suspect smashed his car into the officer's cruiser and made yet another a break for freedom. *See id.* It was only at this point that the officer used deadly force to prevent the suspect's escape. *See id.* The Sixth Circuit concluded that the officer's use of deadly force was justified given that the suspect had demonstrated that he posed a major threat to other officers and the public. *Id.* at 347.

In *Cole v. Bone*, 993 F.2d 1328 (8th Cir. 1993), a suspect driving an eighteen-wheel tractor trailer led the police on a lengthy highway chase at speeds exceeding ninety miles per hour. 993 F.2d at 1330. The suspect thwarted multiple efforts to establish a rolling roadblock, ran through a stationary roadblock, refused to stop after the police had shot out two of the truck's tires, and forced more than one hundred innocent motorists off the road. *See id.* at 1330-31. During the chase, the pursuing officers were continuously compelled to take measures in order to stop the suspect from hitting both police and civilian vehicles on a crowded highway. *See id.* at 1331. After multiple attempts to stop the truck using other means had failed, one of the pursuing officers shot twice at the truck, hoping to disable its engine. *See id.* The suspect was fatally wounded by the second shot. *See id.* The court held that, in light of all the information available to the officer, it was reasonable for the officer to conclude that the suspect posed an imminent threat of serious harm. *See id.* at 1333.

Finally, in *Scott v. Clay County*, 205 F.3d 867 (6th Cir. 2000), the police began pursuing a suspect who had raced through an intersection in contravention of a stop sign. 205 F.3d at 871. Rather than stop for the police, the suspect led them on a twenty-minute chase over rural roads at speeds ranging from eighty-five to one hundred miles per hour. *See id.* at 872. The driver testified that he forced at least one motorist off the road during the chase. *See id.* After the suspect's vehicle crashed into a guardrail and came to a stop, one of the pursuing officers parked and exited his cruiser to make an arrest. *See id.* The suspect's vehicle rapidly accelerated in the officer's direction, forcing the officer to leap out of the way to avoid being struck. *See id.* As

11

Second, a reasonable jury could find that it was feasible for Cox to warn the truck's occupants of the potential application of deadly force. According to Vaughan's version of events, Cox pulled his cruiser parallel to the truck, turned his rooftop lights on and waited for thirty to forty-five seconds before firing his weapon. A reasonable jury could therefore conclude that Cox had the time and opportunity to warn Vaughan and Rayson that he was planning to use deadly force before he opened fire.

Although we are loathe to second-guess the decisions made by police officers in the field, we simply cannot conclude as a matter of law that a reasonable jury could not find that Deputy Cox's actions were objectively unreasonable. We note again that Deputy Cox disputes much of Vaughan's description of the events leading up to the shooting. For example, Cox maintains that the suspects rammed his vehicle, not once but twice and swerved as if to run him off the road before Cox fired his weapon. These assertions, if proven, would establish that Vaughan and Rayson represented a threat to Cox or others on the road and suggest that it was not feasible for Cox to give

the suspect sped at another police vehicle that was approaching the scene, the officer fired his weapon to stop the suspect's escape. *See id.* In holding that the officer acted reasonably in applying deadly force, the Sixth Circuit concluded that the record demonstrated that the suspect's "ongoing felonious misconduct posed an immediate threat to the safety of officers as well as innocent civilians." *Id.* at 877. Unlike the situations presented in *Smith*, *Cole*, or *Scott*, it is less clear in the instant case that Vaughan and Rayson presented a immediate threat of serious harm to the pursuing officers or other motorists.

the truck's occupants prior warning. However, our obligation at this stage of the proceeding is to view all of the evidence in the light most favorable to Vaughan. Under this standard, genuine issues of material fact exist as to whether the suspects' flight was likely to endanger others on the road and whether Cox had the opportunity to warn Vaughan and Rayson before firing. Accordingly the district court erred in granting the defendants summary judgment on the basis that no Fourth Amendment violation occurred.

*Qualified Immunity*

We now turn to the question of whether Deputy Cox should be shielded from suit based on qualified immunity. As noted above, an officer is required to have probable cause to believe either that a suspect committed a crime involving the infliction or threatened infliction of serious harm or that the suspect presents a threat of serious physical harm before the officer can use deadly force. *See Garner*, 471 U.S. at 11, 12, 105 S. Ct. at 1701. The standard for resolving whether an officer who did not have the requisite probable cause to use deadly force should still be entitled to qualified immunity against suit is similar yet distinct. *See Saucier v. Katz*, ___ U.S. ___, 121 S. Ct. 2151, 2158 (2001). Under that standard, an officer will be entitled to qualified immunity if he had "'arguable probable cause'" that the suspect either had committed a violent crime or presented a threat of serious harm. *Montoute v. Carr*,

114 F.3d 181, 184 (11th Cir. 1997). To find arguable probable cause, we must conclude that "the officer reasonably could have believed that probable cause existed." *Id.* We apply an objective standard, asking "whether the officer's actions are objectively reasonable in light of the facts confronting the officer, regardless of the officer's underlying intent or motivation." *Id.* at 183.

We conclude that a reasonable officer in Deputy Cox's position could have believed that he had sufficient probable cause to apply deadly force. At the time he fired his weapon, Cox had clearly demonstrated to the truck's occupants that he wanted them to stop and had seen the driver instead speed up to avoid apprehension. A reasonable officer in Cox's position could have concluded that the suspects, who were fleeing down a major highway at approximately eighty to eighty-five miles per hour in a pickup towing a trailer laden with two personal watercraft and apparently were not about to stop, posed a serious threat of harm to other motorists. Therefore, while a reasonable jury could find that Deputy Cox was mistaken in his belief that he had probable cause to use deadly force, we cannot say that a reasonable officer in Cox's position could not have believed that such probable cause existed.

We also conclude that the law was not sufficiently established on the day of the shooting that Deputy Cox knew that he needed to warn the occupants of the truck before firing his weapon. Qualified immunity provides complete protection for

14

government officials sued in their individual capacities as long as "their conduct violates no 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Lassiter v. Ala. A&M Univ.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 2738 (1982)). The law will not be deemed "clearly established" unless it was developed at the time of the alleged violation "in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that 'what he is doing' violates federal law." *Id.* (quoting *Anderson v. Creighton*, 483 U.S. 635, 640, 107 S. Ct. 3034, 3039 (1987)). The pre-existing law must "truly compel (not just suggest or allow or raise a question about)" the conclusion that "what defendant is doing violates federal law *in the circumstances*." *Id.* at 1150 (emphasis in original).

As noted above, the Supreme Court has held that a police officer must warn a suspect of the potential application of deadly force "where feasible." *See Garner*, 471 U.S. at 11-12, 105 S. Ct. at 1701. However, aside from establishing a broad mandate to provide some form of warning, the *Garner* Court made no effort to define under what factual situations such a warning would be necessary. Nor has the Supreme Court, this court, or the Supreme Court of Georgia held that a warning was necessary in factual circumstances similar to those in this case. *See Hamilton v. Cannon*, 80

15

F.3d 1525, 1532 n. 7 (11th Cir. 1996) (law can be clearly established in this circuit only by decisions of the U.S. Supreme Court, this court, or the highest court of the state from which the case arose). In short, the law was not defined in such a concrete way that a reasonable officer in Deputy Cox's position would have been compelled to conclude that it was unconstitutional to fire his weapon without first warning Vaughan and Rayson. Accordingly, we affirm the district court's grant of summary judgment to Deputy Cox because he is protected by qualified immunity.

*Substantive Due Process*

We also conclude that Vaughan's alternative substantive-due-process claim based on Cox's alleged deliberately indifferent and conscience-shocking conduct lacks merit. The Supreme Court has held that in cases where police officers are required to make quick judgments about the proper course of action and therefore cannot deliberate before acting, even a showing that the officer's recklessness caused the plaintiff's injury is insufficient to support a substantive-due-process claim. *See County of Sacramento v. Lewis*, 523 U.S. 833, 853-54, 118 S. Ct. 1708, 1720 (1998). Instead, a violation of substantive due process will be found only when a plaintiff can show that the officer had "a purpose to cause harm unrelated to the legitimate object of arrest . . . ." *Id.* at 836, 118 S. Ct. at 1711. Vaughan has not presented any evidence to suggest that Cox's actions were motivated by anything but the desire to

16

arrest Rayson and Vaughan. Accordingly, we affirm the grant of summary judgment to all defendants on Vaughan's substantive due process claim.

*Conclusion*

While we conclude that a reasonable jury could find that Deputy Cox's shooting of Vaughan was an unreasonable seizure and therefore unconstitutional, we affirm on qualified immunity grounds the district court's grant of summary judgment to Cox on Vaughan's individual-capacity claim. We similarly affirm the grant of summary judgment to all defendants on Vaughan's alternative Fourteenth Amendment substantive-due-process claim. Because it found that no constitutional violation had occurred, the district court did not address whether a viable official capacity action could be brought against Deputy Cox or Sheriff Yeager, as well as whether the County could be held liable for Cox's actions.[9] We therefore vacate the judgments in favor of Cox and Yeager in their official capacity and the judgment in favor of the County and remand for the district court to address these issues in the first instance.

AFFIRMED IN PART; VACATED AND REMANDED IN PART.

---

[9] The parties disagree as to whether Sheriff Yeager is an officer of the County or an officer of the State of Georgia. It is not clear what entity is sued in Vaughan's official-capacity claims against Cox and Yeager.

17

NOONAN, Circuit Judge, dissenting:

Fred Lawrence Cox, an officer of the Coweta County Sheriff's Department in Coweta County, Georgia, drew his police cruiser parallel to a suspected thief driving a pickup on I-85, waited between thirty and forty-five seconds and then, having rolled down his window, discharged three rounds into the front seat of the pickup, wounding Jerry Charles Vaughan and paralyzing him for life.

The majority is of the opinion that Deputy Cox violated Vaughan's right under the Fourth Amendment to be free of unreasonable seizure by an agent of the state. The majority is also of the opinion that Cox had time to warn the occupants of the pickup that he would shoot if they didn't stop. But the majority holds as a matter of law that Cox would not have reasonably known that his shots were in violation of human rights secured by our Bill of Rights and made binding on the states by the Fourteenth Amendment.

Cox as a reasonable police officer is presumed to be familiar with *Tennessee v. Garner*, 471 U.S. 1 (1985). He, therefore, knew:

1. That it is an unconstitutional use of force to shoot a residential burglar without warning, even if it is at night and the thief has a good chance of escaping. *Id*. at 4.

2. That such police behavior violates the Fourth Amendment even though a state statute authorizes the behavior. *Id*. at 5.

18

3. That such police behavior is unreasonable even though the police officer has to make a "difficult," even "split second" evaluation of "unknowable facts." *Id*. at 20.

Deputy Cox had particular reason to be acquainted with the appropriate standard because only four months before he shot Vaughan he had conducted a high speed chase of a pickup truck driven by a suspected burglar and then discharged his firearm into the pickup, wounding its passenger. It can scarcely have escaped the notice of his superiors or his own conscience that there were constitutional standards that govern the use of deadly force to seize a thief.

The majority says the Supreme Court has not established the circumstances under which a police officer will find it feasible to give a warning before he shoots. Au contraire, *Tennessee v. Garner* has very clearly established that it is feasible to give a warning if the officer has time before he shoots, has no reason to believe that the suspect will shoot or otherwise injure him, and the reason for seizing the suspect by shooting is simply to prevent his escape.

*Tennessee v. Garner, supra* was applied by the Second Circuit to a Waterbury, Connecticut policeman shooting an escaped felon without warning. *Davis v. Little*, 851 F.2d 605, 608 (2d Cir. 1988). *Garner* was not only applied but applied retroactively; the police shooting had occurred in 1981. *Id*. at 609. If a policeman in Connecticut in 1981 should have known what the constitution required, should not a policeman in Georgia in 1998?

*Garner* was a guide to the constitutionality of St. Paul, Minnesota police shooting a mentally disturbed man armed with a knife and engaged in bizarre behavior. *Ludwig v. Anderson*, 54 F.3d 465, 471 (8th Cir. 1995). The court noted the Supreme Court's words that a seizure by deadly force was "unmatched" in its intrusiveness on the human person and "frustrates the interest of the individual, and of society, in judicial determination of guilt and punishment." *Id.* at 471 (quoting *Garner*, 471 U.S. at 9). The policeman is not to be both judge and executioner. The court noted the Supreme Court's teaching, "It is not better that all felony suspects die than that they escape." *Id.* (quoting *Garner*, 471 U.S. at 11). Law enforcement is not the supreme value. If these messages should have guided the police in Minnesota in a situation factually different from the apprehension of a thief at night, should they not have been equally clear to Deputy Cox?

To be sure, Cox's case is not on all fours with that of Memphis Police Officer Elton Hymon of *Tennessee v. Garner*. Few cases are on all fours with each other. Constitutional rights would be at the mercy of uncontrolled police if close factual similarity were required. The test, however, is not whether "the very action in question has previously been held unlawful," but whether, "in the light of pre-existing law the unlawfulness [is] apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). If it was unlawful in 1985 for a Memphis policeman to shoot without warning a suspected burglar fleeing at night, it was known to any reasonable Coweta County, Georgia sheriff's deputy in 1998 that it was contrary to the constitution of the United

States to shoot three times in broad daylight into a vehicle carrying two human beings, who were probably thieves in flight but who certainly had lives more valuable than the property the policeman was so dangerously and so stupidly and so unconstitutionally seeking to protect.