[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

_____

No. 12-10967
_____

D.C. Docket No. 2:10-cv-00505-UA-SPC


THAD M. RHODES,

Defendant-Appellant,

versus

VERONIKA KOLLÁR,

Plaintiff-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida

_____

(January 17, 2013)

Before HULL and FAY, Circuit Judges, and GOLDBERG,[*] Judge.

PER CURIAM:

_____

[*] Honorable Richard W. Goldberg, United States Court of International Trade Judge, sitting by designation.

Defendant-Appellant Thad M. Rhodes, a deputy sheriff for Collier County, Florida, appeals the district court's denial of his motion for summary judgment on the basis of qualified immunity.  In the original proceeding, Plaintiff-Appellee Veronika Kollár sued Rhodes for malicious prosecution under state law and 42 U.S.C. § 1983.[1]  Rhodes argues that he had qualified immunity because probable cause existed for Kollár's arrest for grand theft.  After oral argument, reviewing the record, and for the reasons that follow, we reverse the district court's order denying Rhodes's motion for summary judgment as to Kollár's § 1983 claim.

## I. FACTS

In January 2008, Kollár came to Florida from her native Hungary.  She speaks very little English. While in Florida, she took a short-term job working for Peter Gede and his wife, Leasa Flannigan, who operate a corporate cleaning business, Elite Care.

Gede, who speaks fluent Hungarian, hired Kollár and assigned her to clean a Metro PCS store in Naples, Florida.  Flannigan speaks only a few words of Hungarian; however, due to her husband's unavailability, she trained Kollár to clean the Metro PCS store.  This training included teaching Kollár to take some of the boxes near the store's rear door to the dumpsters.  Flannigan explained to

---

[1] This is an interlocutory appeal of the district court's denial of qualified immunity as to the § 1983 claim in Count I of the complaint.  The state law claim in Count II is not part of this appeal.

2

Kollár, through simple words like "yes" and "no" and emphatic sign language, that the boxes on the left side of the door were to be discarded. Likewise, she explained to Kollár that the boxes on the right side of the door contained valuable merchandise and were not to be touched.

On the morning of February 14, 2008, Metro PCS employee Richard Becker could not find equipment that he verified had shipped to the store. Becker and store manager Jeff Allen pulled the store's surveillance tapes. [2] The store kept trash to be discarded on the left side of the rear door and boxes with merchandise on the right side of the rear door under a sign that said "UPS Pickup." According to Becker and Allen, these video tapes showed Kollár taking the unopened boxes of merchandise out of the rear door of the store and then returning empty-handed. Becker claimed they "found that [Kollár] was taking shipments for the following dates 1/23, 1/26, 1/29, 1/31, 2/13, 2/15," for a total of "22 items totaling approximately $347,000.00 dollars in value." In his own sworn affidavit, Allen attested to observing Kollár in the video tapes take merchandise from the store on February 13 and February 15, 2008. The missing items included transmitters and high-end merchandise used to build and repair cell phone towers.

---

[2]Though it is not clear from the record, Becker and Allen must have pulled the video tapes on February 15, since they reviewed a video tape made in the early morning hours of February 15.

3

On February 15, 2008, the Metro PCS store manager Allen contacted the Collier County Sheriff's Office to report a theft of equipment. Rhodes, a Collier County deputy sheriff assigned to investigate property crimes, reported to the Metro PCS store to investigate. Rhodes met with two Metro PCS employees and reviewed surveillance tapes from several evenings. Rhodes, and the Metro PCS employees again, observed Kollár on the surveillance tapes taking out not only the trash but also the unopened boxes containing merchandise. On most occasions, Kollár carried the boxes, whether empty or not, out of the door and turned left, in the direction of a dumpster. However, sometimes when carrying boxes from the right side of the door (i.e., the unopened boxes with merchandise), she turned right, away from the dumpster.

Rhodes obtained sworn statements from Becker and Allen as to what they had seen on the surveillance tapes. The store also provided Rhodes with a list of the missing merchandise. Rhodes checked the dumpster behind the Metro PCS store, but he found no boxes or equipment inside. Rhodes also interviewed Flannigan, who stated that she thought that Kollár understood that only boxes to the left side of the door were to be discarded.

On February 16, 2008, Kollár was driving one of Gede's cars when she was stopped for having an expired license plate. She was arrested at that time and

4

charged with driving without a valid license.  This theft charge was added to Kollár while in jail.

After her arrest, Rhodes interviewed Kollár with the help of a translator.  In her interview, Kollár said her understanding from Flannigan was that she must throw out *all* boxes placed near the rear door in the store.  When pressed as to why she sometimes went to the right when exiting the rear door with boxes, Kollár said: "Truthfully, I really do not know because I am used to go[ing] like that just then, I go in both directions and sometimes I go across the lawn, too."  Kollár said she did take empty boxes home to use as makeshift furniture but denied taking any boxes containing merchandise.

Rhodes filed a four-page arrest affidavit outlining in great detail how Metro PCS had reported a theft, what Metro PCS employees told him about Kollár's taking specific merchandise on specific dates from Metro PCS, and how they had filed sworn statements about the theft.  We quote in detail parts of Rhodes's arrest affidavit not in issue which establish probable cause for the arrest:

> On this date, 02/15/2008, I was notified by Cpl. Lee # 1138 and asked to respond to the Metro PCS Store located at 2650 Immokalee Rd in reference to a Grand Theft incident that had taken place.  Upon my arrival I made contact with Cpl. Lee and the reporter Richard Becker, who is the South Region Engineer for Metro PCS, who stated to me what had taken place in regards to the incident.
> While speaking with Richard, he stated that on this date, 02/15/08, he responded to the Metro PCS Store in Naples, Florida to pick up some equipment that had been delivered to the store on

5

02/14/08.  Upon arrival at the Metro PCS Store, Richard stated that it was then he found the property/equipment missing.  Richard stated that the day prior, the equipment had been stacked in boxes next to the back door under a sign reading UPS Pickup/ Delivery.  Richard began asking employee[s] in the store if they knew anything about the whereabouts of the equipment.  After getting negative results, Richard stated that he then made contact with store manager Jeff Allen about the incident.  Richard and Jeff then responded to the office where they were able to view the security cameras from the night before.

Richard stated that while watching the store['s] security video, he captured the cleaning lady (later identified as Veronika Kollar) in the store doing her normal duties.  As Richard continued to watch the security video he observed suspect Kollar take a box containing Metro PCS Equipment outside the business.  Richard stated that as he continued to watch the video, he observed Kollar take the trash out and then proceed to take boxes containing Metro PCS equipment outside of the business.  As Richard continued to watch the security video he observed Kollar take a total of 4 boxes from the business.  Richard stated that the value of equipment taken on the morning of 02/15/08 at approximately 0500 hours was approximately $53,500.00.  The 4 boxes taken on this date contained a PDP II Power Distribution Panel, ULAM Amplifier Unit, PKLAM Amplifier Unit and PKLAM Amplifier Unit.

Concerned about other items missing from the business, Richard then checked his equipment order log and found other dates that items were ordered, but were missing from the business.  Richard and Jeff continued to view the video from previous days/dates and the videos they observed showed Kollar, once again, taking out the trash and taking out the boxes containing Metro PCS equipment, outside of the business.

Richard stated that on 02/13/08 a total of 9 boxes were taken out of the business by Kollar at approximately 0500 hours and the value of the equipment taken is approximately $105,200.00.  The 9 boxes taken on this date contained a ULAM Amplifier Unit, Filter Unit x2, CMU IV, Oscillator Module, CPC-B Circuit Power Control Unit, Heat Exchange Fan and an Amplifier Module x2.

Richard stated that on 01/31/2008 a total of 5 boxes were taken out of the business by Kollar at approximately 0400 hours and the value of the equipment taken is approximately $75,000.00.  The 5

6

boxes taken on this date contained a PKLAM Amplifier, URC70 Central Control Card, CMU III Channel Element Unit, Secondary Amplifier Fan and an ULAM Amplifier.

Richard stated that on 01/29/08 a total of 4 boxes were taken out of the business by Kollar at approximately 0420 hours and the value of the equipment taken is approximately $55,000.00. The 4 boxes taken on this date contained a ULAM Amplifier, PKLAM Amplifier, CMU III Channel Element Unit and a Secondary Amplifier Fan.

Richard stated that on 01/26/08 a total of 3 boxes were taken out of the business by Kollar at approximately 0420 hours and the value of the equipment taken is approximately $33,500.00. The 3 boxes taken on this date contained a URC70, Heat Exchange Fan and a ULAM Amplifier.

Richard stated that on 01/23/2008 a total of 1 box was taken out of the business by Kollar at approximately 0320 hours and the value of the equipment taken is approximately $25,000.00. The 1 box that was taken on this date contained a CMU III.

It was stated by Richard that the total amount taken by Kollar on the above dates, 01/23/08, 01/26/08, 01/29/08, 01/31/08, 02/13/08, and 02/15/08 had a total value of approximately $347,200.00.

Richard stated that the property taken from the business by Kollar was very high end property. Richard stated that all the equipment is equipment used to build or repair cell phone towers as well as the bases of the towers. While speaking with Richard and Jeff, a sworn statement was taken from both and both stated that on behalf of Metro PCS they did wish to press charges.

While on scene I was able to view the business['s] security camera[] which captured the incidents on tape. While watching the video I did observe the suspect enter the business and do her daily cleaning. While watching the security video I was able to view the back room of the business where packages were delivered. I was able to see where the empty/trash boxes were kept as well as the boxes that have been delivered by UPS or waiting to be picked up by UPS. The boxes for trash are kept on a different wall than that of the boxes waiting to be picked up by UPS.

While watching the video I did observe the suspect, Kollar, take from the business without permission boxes that were to be picked up

7

by UPS.  This occurred and was captured on video on the above dates.
. . .

   After watching the security video, contact was made with Leasa Flannigan who is the owner of Elite Cleaning.  Flannigan responded to my location where she was shown the business['s] security video. Flannigan was able to positively identify suspect Kollar as the subject observed taking the equipment belonging to Metro PCS from the store. . . . Flannigan again stated that Kollar was informed several times that the property under the marked sign was to be left alone and the trash boxes on the opposite wall were to be thrown away.

   While watching the security video I was also able to view footage on nights where thefts did not occur at the business.  On these nights Kollar would leave boxes containing equipment in its place and only take the empty boxes out for trash.

The issue arises here because two other statements in Rhodes's arrest affidavit were not accurate.  First, Rhodes's affidavit asserted that the video showed Kollár going left when carrying out trash and going right when taking out heavy boxes with equipment.  He did not state that she also sometimes went to the left when carrying the heavy boxes.  Second, Rhodes's affidavit stated that Ms. Flannigan had told him both she and her husband trained Kollár and that her husband spoke to Kollár in Hungarian and showed Kollár what to discard and what to leave alone.  However, Flannigan actually told Rhodes that *she* was the one who had trained Kollár and she had explained to Kollár what property was to be left alone and what was to be thrown away.  Rhodes did not provide either the video tapes or Flannigan's recorded statement to the State Attorney.

8

The state commenced criminal proceedings against Kollár for grand theft. A consensual search of her house revealed only three empty boxes she had been using as furniture, which the video tapes showed were taken from the "discard pile." Kollár also submitted evidence that the path going right was more even and safer when carrying heavy boxes to the dumpster in the middle of the night. In late May 2008, Kollár got a new attorney and shortly thereafter the state dropped all charges.

Kollár then brought this action against Rhodes, claiming malicious prosecution under both federal and state law. The district court denied Rhodes's motion for summary judgment based on qualified immunity, holding that there were genuine issues of fact as to whether his arrest affidavit was knowingly false and whether Rhodes could reasonably have believed that Kollár had the specific intent to commit theft.

II. STANDARD OF REVIEW

This Court reviews the district court's denial of summary judgment on qualified immunity grounds *de novo*, viewing facts in the light most favorable to the non-moving party. *See Bennett v. Hendrix*, 423 F.3d 1247, 1249 (11th Cir. 2005); *Montoute v. Carr*, 114 F.3d 181, 182 (11th Cir. 1997). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party

9

is entitled to judgment as a matter of law. *Damon v. Fleming Supermarkets of Fla., Inc.*, 196 F.3d 1354, 1358 (11th Cir. 1999) (citing Fed. R. Civ. P. 56(c)). Rhodes is moving for summary judgment; therefore, we view the facts in the light most favorable to Kollár.

III. DISCUSSION

Qualified immunity protects government officials sued in their individual capacities so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231, 129 S. Ct. 808, 815, 172 L. Ed. 2d 565, 573 (2009). To receive qualified immunity, a government official must first demonstrate that he was engaged in a "discretionary function" when he committed the alleged violations. *Rushing v. Parker*, 599 F.3d 1263, 1265 (11th Cir. 2010). Assuming the official demonstrates this, the plaintiff then bears the burden to overcome qualified immunity by showing that (1) the official violated his/her constitutional or statutory rights and (2) those rights were clearly established at the time the official acted. *Id.* at 1266. The standard is an objective one, "and therefore does not include an inquiry in the officers' subjective intent or beliefs." *Id.* (quoting *Von Stein v. Brescher*, 904 F.2d 572, 579 (11th Cir. 1990)).

To establish her § 1983 federal malicious prosecution claim, Kollár must

10

prove (1) the elements of the common law tort of malicious prosecution and (2) a violation of her Fourth Amendment right to be free from unreasonable seizures. *Kingsland v. City of Miami*, 382 F.3d 1220, 1234 (11th Cir. 2004). In Florida, the elements of the common law tort of malicious prosecution are: (1) an original judicial proceeding was commenced against the plaintiff; (2) the defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in the plaintiff's favor; (4) there was an absence of probable cause for the original proceeding; (5) the defendant had malice; and (6) the plaintiff suffered damages as a result of the original proceeding. *Id.* at 1235.

The existence of probable cause constitutes an absolute bar to claims for malicious prosecution. *Marx v. Gumbinner*, 905 F.2d 1503, 1505–06 (11th Cir. 1990); *Case v. Eslinger*, 555 F.3d 1317, 1326–27 (11th Cir. 2009). More specifically, in qualified immunity cases, the existence of "arguable probable cause" will be enough to bar such claims. *Jones v. Cannon*, 174 F.3d 1271, 1283 n.3 (11th Cir. 1999). In other words, the inquiry is "whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could* have reasonably believed that probable cause existed in the light of well-established law." *Eubanks v. Gerwen*, 40 F.3d 1157, 1160 (11th Cir. 1994).

11

The qualified immunity standard shields from liability "all but the plainly incompetent or those who knowingly violate the law." *Montoute*, 114 F.3d at 184 (quoting *Malley v. Briggs*, 475 U.S. 335, 343, 106 S. Ct. 1092, 1096–97, 89 L. Ed. 2d 271 (1986)).

There is no dispute that Rhodes was engaged in a "discretionary function" when he committed the alleged violations. Thus, Kollár bears the burden of showing that Rhodes violated a clearly established constitutional or statutory right in charging her with grand theft. To do this, Kollár must demonstrate, *inter alia*, that Rhodes lacked probable cause when he sought a warrant to arrest her. The parties' disagreement is properly broken down into two sub-issues: (A) whether Rhodes's false statements in the affidavit supporting the arrest warrant defeat the probable cause showing in the arrest affidavit and thus qualified immunity, and (B) whether Rhodes was required to believe that Kollár possessed the specific intent to commit the crime before swearing out the affidavit.

### A. Rhodes's false statements and omissions do not violate a clearly established constitutional right; therefore, they do not defeat his claim of qualified immunity

Kollár asserts that Rhodes's arrest affidavit was knowingly false in two respects. First, Rhodes's affidavit alleged that when taking out the trash Kollár would exit the back door and go to the left towards the dumpster but go towards

the right when taking out boxes of merchandise.  Second, Rhodes averred that Flannigan *and* her husband, Gede, who is fluent in Hungarian, trained Kollár. Both statements are false: Kollár would sometimes, but not always, go to the right when taking out boxes of merchandise, and it was only Flannigan, a beginner in Hungarian, who trained Kollár.

It is clearly established that "the Constitution prohibits a police officer from knowingly making false statements in an arrest affidavit about the probable cause for an arrest . . . *if such false statements were necessary to the probable cause*." *Jones*, 174 F.3d at 1285 (emphasis added).  The question for this Court thus becomes whether the statements were "necessary for probable cause" to exist— whether Rhodes's affidavit contains other facts sufficient to show probable cause for an arrest warrant.

Disregarding the challenged statements, there are still sufficient facts detailed in the affidavit showing that Rhodes had probable cause to arrest Kollár. First, as outlined in Rhodes's affidavit, the Metro PCS employees reported the theft in great detail.  Second, the surveillance video evidence corroborated their claims and showed Kollár taking unopened merchandise boxes from the right side of the door to be picked up by UPS and carrying them outside and walking in the opposite direction from the dumpster on some of the occasions.  Also, Rhodes

13

relied on Flannigan's statement that Kollár was informed several times what boxes were to be thrown away and which were to be left alone. In addition, the video showed Kollár taking out the trash boxes on nights where no thefts occurred yet leaving the boxes with the merchandise in their place on the right side of the rear door.

Therefore, Rhodes did not violate a clearly established constitutional right because his challenged omission and misstatements were not necessary for a finding of probable cause.[3]

### B. There was probable cause to arrest Kollár; therefore, Rhodes is entitled to qualified immunity

Under Florida law, theft is a specific intent crime. The parties' dispute centers around whether, to establish probable cause for arrest for theft, a reasonable officer in Rhodes's position was required to reasonably believe that Kollár had the specific intent to commit the crime of theft. It is well-established and indisputable that qualified immunity is an objective standard. *Rushing*, 599 F.3d at 1265. The question for this Court is not whether Rhodes's subjective belief was reasonable. Instead, the inquiry is "whether a reasonable officer in the same circumstances and possessing the same knowledge as the officer in question *could*

---

[3] Because we find probable cause existed, we need not rely on arguable probable cause although that existed, too.

14

have reasonably believed that probable cause existed in the light of well-established law." *Eubanks*, 40 F.3d at 1160.

Rhodes argues the law does not require him to have evidence of Kollár's specific intent to steal when swearing out the arrest affidavit.  He claims that "[a]rguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest," and argues that such a requirement "would negate the concept of probable cause and transform arresting officers into prosecutors." *Scarbrough v. Myles*, 245 F.3d 1299, 1302–03 (11th Cir. 2001).

Rhodes knew, and reported in his affidavit, the following information prior to charging Kollár with theft: (1) employees of Metro PCS reported that Kollár had removed their property from the store without permission and they wished to press charges; (2) surveillance video showed Kollár removing the unopened boxes of merchandise which were located in a separate area from the trash and taking them out the door; (3) Flannigan advised Rhodes that she trained Kollár and informed her as to which boxes to discard and which boxes to leave alone; and (4) that Kollár knew which items were trash and which items were merchandise was corroborated by the video tapes Rhodes reviewed showing video footage on nights where thefts did not occur and on these nights Kollár took out the trash boxes from

15

the left side and would leave the unopened boxes of merchandise where they were on the right side of the rear door.  A reasonable officer could infer Kollár's intention from her actions.  *See United States v. Martinez*, 96 F.3d 473, 478 n.7 (11th Cir. 1996) ("'[A]cts indicate the intention' is an old maxim.").  An officer is not required to obtain a confession or admission from Kollár to prove her intent.

A reasonable officer in Rhodes's same circumstances and possessing the same knowledge as Rhodes could have reasonably believed that probable cause existed in light of well-established law.  *See Eubanks*, 40 F.3d at 1160.  Although theft is a specific intent crime under Florida law, it is not necessary that an officer prove every element of the crime before making an arrest.  *Scarbrough*, 245 F.3d at 1302–03; *see, e.g.*, *United States v. Everett*, 719 F.2d 1119, 1120 (11th Cir. 1983) (*per curiam*) (indicating intent was an element of the crime of conspiracy to pass counterfeit money, but such intent was not necessary to establish probable cause to arrest, and the passing of a counterfeit note coupled with the identification of the person who passed the note furnished probable cause to arrest the individual identified as passing the note); *Harrell v. United States*, 875 F.2d 828, 830 (11th Cir. 1989) (concluding that officer's knowledge of plaintiff's possession of marijuana floating in the water provided sufficient probable cause to arrest; officer was not required to investigate further to determine actual criminal intent).

16

This Court finds that Rhodes had probable cause to arrest Kollár for theft and is therefore entitled to qualified immunity.  We REVERSE the district court's order denying Officer Rhodes's motion for summary judgment based on qualified immunity and direct entry of judgment in favor of the Defendant Thad M. Rhodes on the § 1983 claim.

**REVERSED.**