[PUBLISH]

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 18-12371

_____

NICHOLAS C. WADE,

Plaintiff-Appellant,

*versus*

SOLOMON DANIELS,
DeKalb County Sheriff's Department,
VICTOR JONES,
DeKalb County Sheriff's Department,
KERRY WILSON,
DeKalb County Sheriff's Department,
MS. S. SPEARS,
DeKalb County Sheriff's Department,

Defendants-Appellees.

———————————

Appeal from the United States District Court
for the Northern District of Georgia
D.C. Docket No. 1:16-cv-00095-MLB

———————————

Before WILSON, JILL PRYOR, and LAGOA, Circuit Judges.

WILSON, Circuit Judge:

Nicholas Wade brought this 42 U.S.C. § 1983 action against several DeKalb County, Georgia investigators, alleging that they violated his constitutional rights during his arrest.  Wade claims that Solomon Daniels used excessive force when he shot him three times, that Victor Jones used excessive force when he pistol-whipped him, and that Daniels, Jones, and Kerry Wilson were deliberately indifferent to his serious medical need after the shooting. The district court granted summary judgment for the investigators on every claim.  The district court also denied Wade's motion to amend his complaint to add A. Beach[1] as futile.

In deciding this case, we express no sympathy for Wade; he was pursued and arrested for murdering a child, for which he was ultimately convicted.  But we must view the facts in the light most favorable to him and draw reasonable inferences in his favor. Bound by that standard, we reverse the district court's grant of

---

[1] The record includes only Beach's first initial.

summary judgment for Jones on the pistol-whip claim.  But we affirm the district court's grant of summary judgment for Daniels on the shooting claim and for Daniels, Jones, and Wilson on the deprivation of medical care claim.  We also affirm the district court's denial of Wade's motion to amend his complaint.

## BACKGROUND

The record, viewed in the light most favorable to Wade, would support these findings.  The DeKalb County Sheriff's Department identified Wade as a suspect in the death of Keon Belk, a toddler.  Keon's mother, Jillian Belk (Belk), was Wade's girlfriend.

Investigators convinced Belk to meet with Wade.  On February 5, 2014, Belk picked up Wade.  Before she picked him up, the investigators had left a cell phone in the backseat of her car so that they could hear what Belk and Wade were saying.  The officers heard Wade accuse Belk of having led the police to him and heard Belk say, "I'm scared."  The investigators followed Belk's car into a parking lot, where they surrounded the car.  At least eleven officers were on the scene.

Daniels and Wilson approached the driver's side of Belk's vehicle, and Jones and Beach (incorrectly identified in the complaint as Stacey Spears) approached the passenger side.  Each investigator drew his or her gun and noticed that Wade held a sawed-off shotgun with the barrel pointed at his own chin.  Upon hearing the investigators, Wade instinctively turned his head towards Jones while still pointing the weapon at his own chin.  Then, without warning, Daniels fired three shots through the driver-side window

at about 2:03 p.m., hitting Wade in the head, shoulder, and leg. Wade crumpled onto the vehicle's center console and dropped the shotgun between his legs. Daniels said, "I shot that motherfucker in the head," and that "mother-fucker will die any [] minute."

Beach opened the passenger door of the vehicle, removed the shotgun, placed Wade in handcuffs, and searched him for weapons. She then pinned Wade down to restrict his movements, and he began to suffocate on the blood filling his mouth. Wade asked Beach to allow him to sit up so he could breathe, but Beach maintained pressure on Wade's head. Wade, still handcuffed, "removed" Beach's hands from his head and tried to sit up. In response, Jones slammed his handgun against Wade's face, chipping his tooth and causing lacerations to his face and mouth.

Wilson instructed another investigator on the scene to call an ambulance. At 2:07 p.m.—four minutes after the shooting—an investigator communicated over his radio that shots were fired and requested EMS. One minute later the investigator said that someone had been shot in the head. The ambulance arrived at 2:16 p.m. and transported Wade to the hospital at 2:39 p.m.

Wade was indicted on several counts, including aggravated assault on a peace officer relating to an arrest. A jury convicted Wade on that count. Wade then filed this § 1983 action against Daniels, Jones, Wilson, and Spears, alleging that they used excessive force and deprived him of medical care during his arrest. The investigators ultimately moved for summary judgment, claiming that they were entitled to qualified immunity on all of Wade's claims. After reviewing the documents provided by the

investigators in their motion, Wade realized that he had wrongly identified Beach as Spears, so he requested leave to amend his complaint accordingly. The district court granted the investigators' motion for summary judgment on all claims and as to all defendants. It also denied Wade's request to amend his complaint.

## DISCUSSION

### I.    Summary Judgment

We review a grant of summary judgment de novo, viewing the evidence and all resulting inferences and doubts in the light most favorable to the non-moving party. *Kingsland v. City of Miami*, 382 F.3d 1220, 1225–26 (11th Cir. 2004), *abrogated in part on other grounds by Nieves v. Bartlett*, 587 U.S. ___, 139 S. Ct. 1715, 1726 (2019). Summary judgment is appropriate only "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

Wade argues that the district court erred in granting the investigators summary judgment on his excessive force and deprivation of medical care claims because they were not entitled to qualified immunity. "When determining whether a defendant is entitled to qualified immunity, we resolve any issues of material fact in favor of the plaintiff." *Alston v. Swarbrick*, 954 F.3d 1312, 1317–18 (11th Cir. 2020). Qualified immunity protects government officers acting within their discretionary authority from liability for civil damages unless a plaintiff can show (1) that the officer violated a federal statutory or constitutional right, and (2) that the

unlawfulness of the officer's conduct was clearly established at the time. *Williams v. Aguirre*, 956 F.3d 1147, 1156 (11th Cir. 2020).

A right is clearly established if (1) a case with facts materially similar has been decided by the United States Supreme Court, the Eleventh Circuit, or the applicable state supreme court before the challenged conduct; (2) a broader, clearly established principle controls the facts of the situation; or (3) the conduct so obviously violates the constitution that prior case law is unnecessary. *Gaines v. Wardynski*, 871 F.3d 1203, 1208 (11th Cir. 2017). The goal is to ensure that "some established law" provided officers with "fair warning" that their conduct was unconstitutional. *Sebastian v. Ortiz*, 918 F.3d 1301, 1311 (11th Cir. 2019).

## A.    Excessive Force Claims

"The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). But this right does not protect against "a use of force that is necessary in the situation at hand." *Jean-Baptiste v. Gutierrez*, 627 F.3d 816, 821 (11th Cir. 2010) (quotation marks omitted). We determine whether an officer's use of force was lawful by assessing whether an "objectively reasonable officer in the same situation could have believed the use of force was not excessive." *Brown v. City of Huntsville*, 608 F.3d 724, 738 (11th Cir. 2010).

Wade argues that Daniels and Jones used excessive force in violation of his clearly established rights and thus are not entitled

to qualified immunity.  Even if we assume that Daniels used excessive force in shooting Wade, we conclude that there was no law clearly establishing that Daniels's conduct violated Wade's constitutional rights.  But we hold that Jones used excessive force in pistol-whipping Wade and that Wade's right to be free of Jones's use of force was clearly established at the time.

### 1.     *Daniels's Shooting*

Wade argues that Daniels violated his Fourth Amendment right to be free of excessive force when he shot him three times. When evaluating the reasonableness of a use of deadly force, we must weigh "the seriousness of the crime, whether the suspect poses an immediate danger to the officer or others, whether the suspect resisted or attempted to evade arrest, and the feasibility of providing a warning before employing deadly force." *Jean-Baptiste*, 627 F.3d at 821.  The second factor essentially asks "whether, given the circumstances, the suspect would have appeared to reasonable police officers to have been gravely dangerous." *Penley v. Eslinger*, 605 F.3d 843, 851 (11th Cir. 2010) (alteration accepted).

Wade claims that these factors show that Daniels's use of deadly force was unreasonable.  He argues that he was not resisting or trying to evade arrest, and he was not posing any immediate danger by pointing a shotgun at his own chin.  He also asserts that the district court improperly applied *Heck v. Humphrey*, 512 U.S.

477 (1994),[2] to hold that it was required to accept that Wade "swung the gun in the direction of" Jones "moments before" Daniels shot Wade. Wade claims that the district court should have accepted his version of the facts instead.

We need not address the *Heck* issue because even accepting Wade's version of the facts, and even assuming that Daniels's use of deadly force was unreasonable, the unlawfulness of his conduct was not clearly established at the time. Wade cites only *Mercado v. City of Orlando*, 407 F.3d 1152, 1161 (11th Cir. 2005), to support his argument that Daniels violated a clearly established right, and that case is readily distinguishable.

In *Mercado*, law enforcement officers responded to a call that a man was threatening suicide. *Id.* at 1154. When the police arrived on the scene, Mercado was crying on the kitchen floor. *Id.* He was holding a knife and pointing it towards his heart. *Id.* The officers directed Mercado to drop his knife at least twice, but he refused. *Id.* He made no threatening moves towards the officers, and the officers failed to warn him that they would use force if he did not drop the weapon. *Id.* But one of the officers hit Mercado with a Sage SL6 Launcher—a "less lethal munition"—twice to subdue him. *Id.* at 1154–55 (internal quotation mark omitted). Mercado suffered a fractured skull and disabling brain injuries. *Id.* at 1155. We concluded that the officer who fired the weapon was not

---

[2] *Heck* bars a § 1983 claim if success on the claim would render a conviction invalid. 512 U.S. at 486–87.

entitled to qualified immunity on Mercado's excessive force claim. *Id.* at 1157–61.

There are several notable differences between *Mercado* and this case. First, Mercado was not suspected of any crime, whereas Wade was wanted for a grave crime: the murder of an 18-month-old child. Second, there was no indication in *Mercado* that anyone felt threatened by Mercado, whereas the investigators here had heard Belk say that she was afraid. And most importantly, the weapon in *Mercado* was a knife, not a gun. As we have recognized, "a person standing six feet away from an officer with a knife may present a different threat than a person six feet away with a gun." *See Perez v. Suszczynski*, 809 F.3d 1213, 1220 (11th Cir. 2016). Given these material differences, *Mercado* did not clearly establish that an officer uses excessive force by shooting a suicidal individual who is holding a gun. Daniels is thus entitled to qualified immunity on Wade's excessive force claim against him.

### 2.    *Jones's Pistol-Whip*

Wade argues that Jones violated his Fourth Amendment rights when he struck Wade in the head with his pistol. Much like the factors we weigh when evaluating a use of deadly force, we consider these factors when evaluating any other use of force: (1) the severity of the suspect's crime, (2) whether the suspect poses an immediate threat of harm to others, (3) whether the suspect is actively resisting arrest or trying to flee, (4) the need for the use of force, (5) the relationship between the need for force and the amount of force used, and (6) how much injury was inflicted. *See*

*Mobley v. Palm Beach Cnty. Sherriff Dep't*, 783 F.3d 1347, 1353 (11th Cir. 2015) (per curiam).  The "gratuitous use of force when a criminal suspect is not resisting arrest constitutes excessive force." *Hadley v. Gutierrez*, 526 F.3d 1324, 1330 (11th Cir. 2008).

After the shooting, Beach handcuffed Wade, removed the shotgun from the vehicle, and searched Wade for other weapons. Viewing the evidence in the light most favorable to Wade, he no longer posed an immediate threat of harm to anyone at that point. He was slumped over the center console—unarmed and severely injured from three gunshot wounds—and Beach was holding him down.  He was not actively resisting arrest or trying to flee.  Even though Wade removed Beach's hands from his head, he did so only after communicating that he could not breathe and needed to sit up so that blood would not fill his mouth.  Because Jones was close enough to pistol-whip Wade right after he tried to sit up, a jury could reasonably infer that he was close enough to hear Wade say that he needed to sit up so that he could breathe.  And regardless, striking Wade in the head with a pistol was disproportionate to any need to restrain Wade given his condition.  Finally, the pistol-whip significantly injured Wade because it struck him in the head, chipping his tooth and cutting his face and mouth.  Given the circumstances, Jones's pistol-whip was an unreasonable, "gratuitous use of force" against a non-resisting suspect. *See Hadley*, 526 F.3d at 1330.

Having determined that Jones's pistol-whip violated Wade's Fourth Amendment right to be free of excessive force, we turn to

whether that right was clearly established at the time. Wade identifies three factually analogous cases. First, in *Hadley*, this court held that an officer was not entitled to qualified immunity when he punched the plaintiff while he was "handcuffed and not struggling or resisting" because "a handcuffed, non-resisting [suspect's] right to be free from excessive force was clearly established in February 2002" and every reasonable officer would know that use of force was unconstitutional. 526 F.3d at 1330, 1333–34. Second, in *Lee v. Ferraro*, we held that an officer used excessive force by slamming an arrestee's head against a car when she was secured in handcuffs because "[o]nce an arrestee has been fully secured, such force is wholly unnecessary to any legitimate law enforcement purpose." 284 F.3d 1188, 1198–99 (11th Cir. 2002). And finally, in *Slicker v. Jackson*, this court held that officers were not entitled to qualified immunity where they hit the plaintiff's head on the pavement and kicked him because he "was handcuffed and did not resist, attempt to flee, or struggle with the officers in any way." 215 F.3d 1225, 1233 (11th Cir. 2000).

The district court distinguished these cases by assuming that Wade was resisting or being uncooperative when he removed Beach's hands from his head. In so doing, the district court failed to view the facts in the light most favorable to Wade and draw reasonable inferences in his favor. Viewing the facts through the appropriate lens, Jones could not have reasonably believed that Wade was resisting when he tried to sit up after communicating that he needed to do so to breathe. And because "a handcuffed, non-resisting [suspect's] right to be free from excessive force was clearly

established" at the time, *see Hadley*, 526 F.3d at 1333, Jones is not entitled to qualified immunity on Wade's excessive force claim against him.

### B.    Deprivation of Medical Care Claim

The Due Process Clause of the Fourteenth Amendment requires government officials to provide medical aid to individuals who have been injured during an arrest. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983).  To succeed on a claim for deprivation of medical care, a plaintiff must prove (1) the existence of an objectively serious medical need, and (2) that the officer was deliberately indifferent to that need. *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).  There is no dispute here that a gunshot wound is an objectively serious medical need.  To prove deliberate indifference, the "plaintiff must present, for each officer, evidence from which a reasonable jury could conclude that (1) the officer was aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, (2) the officer actually drew that inference, (3) the officer disregarded the risk of serious harm, and (4) the officer's conduct amounted to more than gross negligence." *Id.*

An officer may act with deliberate indifference by delaying the treatment of a serious medical need. *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999).[3]  "The tolerable length of delay in

---

[3] The standards for assessing deliberate indifference under the Eighth and Fourteenth Amendments are the same.  *See Lancaster v. Monroe Cnty.*, 116

providing medical attention depends on the nature of the medical need and the reason for the delay." *Bozeman v. Orum*, 422 F.3d 1265, 1273 (11th Cir. 2005) (per curiam), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015). "[W]hen officers *intentionally* delay seeking treatment for a life-threatening injury, they act with deliberate indifference." *Valderrama*, 780 F.3d at 1121 (emphasis added). A jury can also infer deliberate indifference when an officer fails to justify or explain a delay in medical treatment. *See Bozeman*, 422 F.3d at 1273; *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990) (per curiam).

Wade argues that Daniels, Jones, and Wilson violated his Fourteenth Amendment rights by delaying in seeking medical treatment for his gunshot wounds for four minutes. We agree. There is no question that the investigators knew that Wade had been shot in the head and that a substantial risk of serious harm existed. And viewing the evidence in the light most favorable to Wade, a jury could reasonably conclude that the investigators were deliberately indifferent to that harm.

---

F.3d 1419, 1425 n.6 (11th Cir. 1997) ("We have held that the minimum standard for providing medical care to a pre-trial detainee under the Fourteenth Amendment is the same as the minimum standard required by the Eighth Amendment for a convicted prisoner; both the right to due process and the right to be free from cruel and unusual punishment are violated by a government official's deliberate indifference to serious medical needs."), *overruled on other grounds by LeFrere v. Quezada*, 588 F.3d 1317, 1317–18 (11th Cir. 2009).

To start, a jury could find that there was a four-minute delay in seeking medical care. Wade says that he was shot at 2:03 p.m., and that the investigators waited until 2:07 p.m. to call for an ambulance. Although the investigators dispute the timing of the shots to suggest there was no delay, Wilson claimed in his statement that the investigators noticed Wade pointing his gun and that Daniels responded by firing his weapon at "approximately 1403." And the CAD report shows that an investigator communicated "Shots Fired" and requested EMS at 2:07 p.m., and that an investigator communicated that Wade had been shot in the head at 2:08 p.m. Therefore, there is at least a dispute of material fact as to the timing that must be resolved by a jury.

A jury could also infer that the investigators' delay was deliberately indifferent because they provided no explanation for it. Although the investigators claim that Beach provided medical care by pressing on Wade's gunshot wounds, this neither justifies nor explains the delay in requesting real medical attention, much like applying a Band-Aid would neither justify nor explain a delay in seeking medical attention for a stab wound. *See, e.g.*, *Ancata v. Prison Health Servs., Inc.*, 769 F.2d 700, 704 (11th Cir. 1985) ("Although the plaintiff has been provided with aspirin, this may not constitute adequate medical care. If, 'deliberate indifference caused an easier and less efficacious treatment' to be provided, the defendants have violated the plaintiff's Eighth Amendment rights by failing to provide adequate medical care."). And even though a four-minute delay may seem short, this court has explained that evaluating a delay in providing medical attention for life-

threatening injuries "is especially time-sensitive and must ordinarily be measured not in hours, but in *a few minutes.*" *See Valderrama*, 780 F.3d at 1120 (emphasis added) (quoting *Bozeman*, 422 F.3d at 1273). Here, the investigators provide no justification for why it took *eleven* investigators *four minutes* to call an ambulance when Beach had searched, handcuffed, and restrained Wade. And the investigators have failed to point the court to any evidence in the record providing an explanation for what could have preoccupied the investigators while Wade had three gunshot wounds and his mouth filled with blood. Thus, the delay in requesting treatment, coupled with the investigators' failure to provide any explanation for that delay, could lead a jury to reasonably infer that Daniels, Jones, and Wilson were deliberately indifferent to Wade's serious medical need. *See Bozeman*, 422 F.3d at 1273.

From a different angle, a jury could reasonably infer that the investigators intentionally delayed seeking medical attention for Wade. Wade claims that Daniels said, "I shot that motherfucker in the head," and that "mother-fucker will die any [] minute." And after waiting four minutes to ask for ambulance, it took an extra minute for the investigators to report that Wade had been shot in the head. From this evidence, a reasonable jury could infer that the investigators intentionally delayed seeking medical attention to see if Wade would die of his injuries.

To be sure, a reasonable jury could conclude that four minutes was a reasonable amount of time for the investigators to wait to request an ambulance. But it could also conclude just the opposite; whether because the investigators failed to justify their

delay or because they intentionally delayed, a jury could reasonably conclude that Daniels, Jones, and Wilson acted with deliberate indifference. And for that reason, we must conclude that Wade has met his burden at this stage to show that those three investigators violated his Fourteenth Amendment rights.

Even though Wade met his burden that Daniels, Jones, and Wilson violated Wade's Fourteenth Amendment rights, we conclude that there was no established law on how long before officers must request medical care for a suspect that has been shot to constitute deliberate indifference. Although it is clearly established that an officer cannot ignore an individual's serious medical condition, *Brown*, 894 F.2d at 1538, we have not drawn a bright-line rule on how long before officers must seek medical care for a suspect that has been shot to constitute deliberate indifference, *Valderrama*, 780 F.3d at 1120. In *Valderrama*, after considering all the facts of the case, we found that Valderrama proved a deliberate indifference claim because the officers "delayed Valderrama's medical care *for more than ten minutes* for no good or legitimate reason." *Id.* (emphasis added). We specifically noted that "a three and half minute delay standing alone may be insufficient to establish deliberate indifference." *Id.* Accordingly, Daniels, Jones, and Wilson did not have fair warning that their four minute delay in not requesting medical care after a shooting involving a suspect could rise to a deliberate indifference claim. *Sebastian*, 918 F.3d at 1311.

Thus, Daniels, Jones, and Wilson are entitled to qualified immunity on Wade's deprivation of medical care claim.

## II.    Motion to Amend the Complaint

After the time to file an amendment as a matter of course expires, Federal Rule of Civil Procedure 15 allows a plaintiff to amend his complaint only with the opposing party's written consent or leave of court.  Fed. R. Civ. P. 15(a)(2).  Leave to amend should be freely given, but a district court can deny leave to amend the complaint when amendment would be futile.  *See id.*; *Hall v. United Ins. Co. of Am.*, 367 F.3d 1255, 1262–63 (11th Cir. 2004).  Leave to amend is futile if "the complaint as amended is still subject to dismissal."  *Id.* at 1263.  We review the denial of a motion to amend for abuse of discretion, but we review the underlying legal conclusion that an amendment would be futile de novo.  *Corsello v. Lincare, Inc.*, 428 F.3d 1008, 1012 (11th Cir. 2005) (per curiam).

In his complaint, Wade alleged that Spears used excessive force and deprived him of medical care when she held Wade down after the shooting.  But the investigators' summary judgment papers revealed that Wade had incorrectly identified Beach as Spears.  To correct the error, Wade sought leave to amend his complaint.  The district court denied the request, claiming that amendment would be futile because Beach would be entitled to summary judgment on qualified immunity grounds for both claims.  Wade argues that the district court abused its discretion in doing so.

We disagree.  Wade claims that Beach deprived him of medical care by refusing to let him sit up when he said he could not breathe.  Even if Beach's actions were deliberately indifferent to Wade's need to breathe, Wade cites no analogous cases showing

that Beach violated a clearly established right.  The general proposition that an officer acts with deliberate indifference by failing to provide medical treatment to a suspect who communicates his medical distress is not clearly applicable to this situation; there is no allegation that Beach failed to provide medical treatment or delayed Wade's access to medical treatment.  Wade's primary issue appears to be with Beach's *use of force* in restricting Wade's movements.

But Wade's excessive force claim against Beach is futile as well.  Although Wade claims that Beach held him down to give the "false appearance of medical aid," it would be unreasonable to infer that Beach used excessive force.  That Beach applied pressure to Wade's head and body—two places he had been shot—shows that she was trying to prevent excessive bleeding.  And there is no indication that Beach applied an unreasonable or excessive amount of pressure because Wade was able to "remove[] her hand from holding [his] cranium down" so that he could try to sit up and breathe.  Thus, any force that Beach used was proportional to the need to restrict Wade's movements and apply pressure to his wounds to control the bleeding.  Because both claims against Beach would be futile, the district court did not abuse its discretion in denying Wade's request for leave to amend his complaint.

## CONCLUSION

For the reasons stated above, we **REVERSE** the district court's grant of summary judgment on the excessive force claim against Jones.  We **AFFIRM** the district court's grant of summary

18-12371              Opinion of the Court                    19

judgment on the excessive force claim against Daniels and the deprivation of medical care claim against Daniels, Jones, and Wilson and the district court's denial of leave to amend the complaint.

**REVERSED IN PART AND AFFIRMED IN PART.**

18-12371 [LAGOA, J., Concurring in Part and in the Result]          1

LAGOA, Circuit Judge, Concurring in Part and in the Result:

I concur in the majority's decision to affirm the district court's order denying Nicholas Wade's motion for leave to add Investigator A. Beach as a defendant and in the majority's decision to reverse the district court's order granting summary judgment in favor of Investigator Victor Jones on Wade's excessive force claim. I further concur in the result to affirm the district court's order granting summary judgment in favor of Investigator Solomon Daniels on Wade's excessive force claim, although I would affirm the district court's finding of qualified immunity for Investigator Daniels based on the conclusion that his use of force was not excessive.

As the majority's decision notes, Investigator Daniels was part of a team looking to arrest Wade for the murder of a child. During their investigation, the investigative team stopped the vehicle Wade was in after Jillian Belk, the driver of the vehicle and the mother of the murder victim, expressed fear for her safety. As Investigator Daniels approached the vehicle, he saw Wade holding a sawed-off shotgun in close proximity to Ms. Belk and his fellow officers.

In such a "tense and dangerous situation," where the suspect's actions pose a significant risk of serious harm to others, officers are justified in their use of lethal force. *See Long v. Slaton*, 508 F.3d 576, 581 (11th Cir. 2007). Indeed, this Court recognizes that officers are not required "to wait until the moment a suspect uses a deadly weapon to act to stop the suspect." *Id.* For example,

2      [LAGOA, J., Concurring in Part and in the Result]    18-12371

in *Jean-Baptiste v. Gutierrez*, 627 F.3d 816 (11th Cir. 2010), this Court held that an officer's decision to shoot an armed suspect was objectively reasonable because the officer was suddenly faced with the suspect and "was forced to decide in a matter of seconds whether to employ deadly force." *Id.* at 821–22. This Court further concluded that the officer reasonably perceived the suspect as posing a threat of serious harm to others and "[r]egardless of whether [the suspect] had drawn his gun, [the suspect's] gun was available for ready use, and [the officer] was not required to wait 'and hope[] for the best.'" *Id.* at 821 (last alteration in original) (quoting *Scott v. Harris*, 550 U.S. 372, 385 (2007)).

Similarly, in *Montoute v. Carr*, 114 F.3d 181 (11th Cir. 1997), this Court concluded that an officer acted objectively reasonably when he shot a suspect who was fleeing with a sawed-off shotgun in hand. *Id.* at 183–85. The suspect had not pointed the shotgun at anyone and was not even facing the officer, but we acknowledged that "there was nothing to prevent him from doing either, or both, in a split second." *Id.* at 185. Because of the events that reasonably could have unfolded, this Court concluded that a reasonable officer could have believed that the suspect "posed a risk of serious physical injury to [the officer] or others." *Id.*; *see also Long*, 508 F.3d at 583 (finding that an officer's decision to shoot a "psychotic man [to prevent him] from driving away in a marked sheriff's cruiser" was reasonable because of the serious harm that could have occurred if the suspect was allowed to flee in the stolen cruiser).

18-12371 [LAGOA, J., Concurring in Part and in the Result]        3

Based on this Court's precedent, Investigator Daniels was justified in shooting Wade to diffuse the situation and prevent a real risk of serious harm to others. *See, e.g.*, *Montoute*, 114 F.3d at 185. Investigator Daniels encountered Wade—armed with a sawed-off shotgun—and was forced to immediately decide whether deadly force was necessary. Based on Wade's holding the shotgun in close proximity to Ms. Belk, admitted willingness to end his own life, and admission that he "turned with the weapon beneath [his] chin" when the officers approached the vehicle, Investigator Daniels was faced with a tense situation presenting immediate risk of serious harm to Ms. Belk, the driver of the vehicle, and the other officers. From the standpoint of a reasonable officer, it is not unreasonable to believe that Wade was capable and willing to suddenly reposition his shotgun and begin shooting others. Investigator Daniels's use of force was therefore objectively reasonable, as he was not required to wait for Wade to attempt to use his shotgun. *Jean-Baptiste*, 627 F.3d at 821.

The majority correctly concludes that Investigator Daniels is entitled to qualified immunity for his actions but reaches this conclusion based on a determination that Investigator Daniels did not violate Wade's clearly established rights. It is not necessary to decide this claim on the "clearly established" prong of the qualified immunity analysis because, as a threshold matter and as discussed above, Investigator Daniels did not use objectively unreasonable force against Wade. I would therefore affirm the district court's grant of qualified immunity to Investigator Daniels by holding that

4      [LAGOA, J., Concurring in Part and in the Result]    18-12371

his use of force was not excessive.  I therefore concur in the result only as to this claim.

Finally, while I concur in the result of the majority's holding that Investigators Daniels, Jones, and Kerry Wilson are entitled to qualified immunity on Wade's deliberate indifference claim on the basis that "there was no established law on how long before officers must request medical care for a suspect that has been shot to constitute deliberate indifference," Maj. Op. at 16, I respectfully disagree with the majority's conclusion that a jury could infer deliberate indifference by Investigators Daniels, Jones, and Kerry Wilson regarding Wade's medical deprivation claim.  I do so for several reasons.  First, both Wade and the majority opinion fail to judge each defendant separately and on the basis of what that defendant knew.[1]  Second, a *de novo* review of the record establishes that there was not a four-minute delay from the shooting of an armed suspect to the calling of an ambulance.  However, even accepting as true that a four-minute delay had transpired from the time of the shooting to the calling of the ambulance, Wade presented no evidence from which a jury could infer that Investigators Daniels, Jones, or Wilson exhibited deliberate indifference to his serious medical needs.

Before turning to Wade's deliberate indifference claim, I first address the procedural posture of this case, our standard of review,

---

[1] Both the magistrate judge in its report and recommendation and the district court properly analyzed each defendant separately.

18-12371 [LAGOA, J., Concurring in Part and in the Result]        5

and the undisputed facts in the record. Then, I discuss the doctrine of the qualified immunity and legal framework involving a deliberate indifference claim under the Fourteenth Amendment, as relevant to this case. And I conclude with a discussion of Wade's deliberate indifference claim against Investigators Daniels, Jones, and Wilson.

## I.    Summary Judgment and this Court's Standard of Review

Because this case concerns the entry of summary judgment, each of the elements relevant to Wade's deliberate indifference claim must be judged using the standard for summary judgment. This Court reviews *de novo* a district court's order granting summary judgment based on qualified immunity. *Glasscox v. City of Argo*, 903 F.3d 1207, 1212 (11th Cir. 2018); *CAMP Legal Def. Fund, Inc. v. City of Atlanta*, 451 F.3d 1257, 1268 (11th Cir. 2006). "When considering a motion for summary judgment, including one asserting qualified immunity, 'courts must construe the facts and draw all inferences in the light most favorable to the nonmoving party and when conflicts arise between the facts evidenced by the parties, [they must] credit the nonmoving party's version.'" *Feliciano v. City of Miami Beach*, 707 F.3d 1244, 1252 (11th Cir. 2013) (alteration in original) (quoting *Davis v. Williams*, 451 F.3d 759, 763 (11th Cir. 2006)).

"Summary judgment is appropriate if 'the evidence before the court shows that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *McCullough v. Antolini*, 559 F.3d 1201, 1204 (11th Cir.

6    [LAGOA, J., Concurring in Part and in the Result]    18-12371

2009) (quoting *Haves v. City of Miami*, 52 F.3d 918, 921 (11th Cir. 1995)).  The nonmoving party must show more than the existence of a "metaphysical doubt" regarding the material facts.  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986). Speculation, conjecture, or conclusory statements from a party cannot create a genuine issue of material fact.  *See Glasscox*, 903 F.3d at 1213; *Cordoba v. Dillard's, Inc.*, 419 F.3d 1169, 1181 (11th Cir. 2005).  The nonmoving party must either point to evidence in the record or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency.  *See Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1116 (11th Cir. 1993); *Owen v. Wille*, 117 F.3d 1235, 1236 (11th Cir.  1997). But "[a] mere scintilla of evidence in support of the nonmoving party will not suffice to overcome a motion for summary judgment."  *Young v. City of Palm Bay*, 358 F.3d 859, 860 (11th Cir. 2004).

## II.    The Undisputed Record Evidence[2]

Viewing the facts in the light most favorable to the nonmoving party, Wade, the undisputed facts show the following:

Investigator Wilson, Investigator Daniels, and Investigator Jones are investigators with the DeKalb County Sheriff's Office and are assigned to the Fugitive Division.  Investigator Wilson's daily

---

[2] The undisputed facts are taken from the affidavits and accompanying exhibits filed in support of and in opposition to the summary judgment motion as well as Defendants' Responses to Wade's Request for Admissions.

18-12371 [LAGOA, J., Concurring in Part and in the Result]        7

duties involve serving criminal warrants.  On February 5, 2014, In-vestigator Wilson was assigned a murder case, and, that morning, he conducted a briefing attended by investigators of the Fugitive Division, where he informed them that there was a warrant for Wade on the charges of murder and Cruelty to Children-First De-gree.  Investigator Peterson created a "Be on the Lookout" ("BOLO") notice for Wade, which noted that Wade was armed and dangerous.  The Fugitive Unit then began working the case to lo-cate Wade, and Investigator Wilson instructed the investigators to follow up on several leads involving residences.  Investigator Jones and Investigator Beach went to several residences looking for Wade but did not find him.

While at one of the lead residences, Investigators Daniels and Wilson spoke to Alicia Stevenson, the sister of the victim's mother, Jillian Belk, who took the Investigators to Ms. Belk.  Inves-tigators Daniels and Wilson interviewed the victim's mother, Ms. Belk, at an apartment complex and advised her to call them if Wade attempted to contact her.  Investigator Wilson gave his card to Ms. Belk.  Shortly after leaving, Wilson received a call from Ms. Steven-son advising him that Ms. Belk was on the phone with Wade.  In-vestigators Daniels, Wilson, and Peterson returned to the apart-ment.  Wade wanted to see Ms. Belk, and she agreed to meet him at a Wal-Mart.

Ms. Stevenson, Ms. Belk, and Daniels left the apartment and drove to the meeting location in Ms. Stevenson's black BMW. During this time, Investigator Peterson informed the criminal

8    [LAGOA, J., Concurring in Part and in the Result]    18-12371

process investigators to head to the Wal-Mart parking lot. Before arriving at the parking lot, Investigator Daniels had Ms. Stevenson get in the unmarked Ford Taurus driven by Investigator Peterson, and Investigator Wilson had Ms. Belk drive the black BMW. Investigator Daniels remained a passenger in the black BMW until exiting the vehicle at the corner of Chupp and Farington Road.

Wade entered the black BMW and sat in the passenger seat. Ms. Belk and Wade proceeded to travel to the New Birth Missionary Baptist Church parking lot. Investigator Peterson advised additional units to follow the black BMW down Chupp Way. After exiting the BMW, Investigator Daniels ran to the top of the street and entered the vehicle driven by Investigator Peterson. Investigator Wilson feared for Ms. Belk's safety and decided to stop the vehicle.

Investigators Daniels and Wilson exited their unmarked vehicle, removed their firearms from their holsters, and approached the driver door of the black BMW. Investigators Jones and Beach exited their unmarked Dodge Charger and approached the passenger side of the black BMW with their guns drawn. Investigator Wilson was behind Daniels and heard him yell, "Gun." Investigator Daniels observed Wade place the shotgun[3] to his chin, at which time he took a step back and yelled to Wade, "No. Don't do it."

---

[3] Investigator Wilson, in the statement attached to his affidavit, stated that, "at approximately 1403 [or 2:03 p.m.], [the officers] noticed that the subject (Nicholas Wade) had a shotgun in the car with him and he pointed the weapon."

18-12371 [Lagoa, J., Concurring in Part and in the Result]    9

Then, Investigator Daniels observed Wade "swing the shotgun in the direction of Investigator Jones," and it was only at this point that Investigator Daniels finally fired the shots into the vehicle that struck Wade.  Investigator Wilson also saw Wade move the weapon in the direction of Jones.  Neither Investigator Jones nor Investigator Wilson discharged their service weapons.

Wade does not dispute this characterization, and he recounts the events as follows:

> I placed a single-shot weapon under my chin.  As I faced Ms. Belk[,] law enforcement advanced towards the passenger door.  The deputies were screaming.  Before I could pull [the] trigger of [my] weapon to commit suicide[,] Deputy S. Daniels, K. Wilson and V. Jones fired upon the vehicle.  Several projectiles disengage[d] through [the] driver-door pass[ed] Ms. Belk['s] face. The projectiles assaulted my cranium, left-leg and knee.  Ms. Belk went into shock because [the] Deputies discharged their weapon through Ms. Belk ['s] window.

Wade further admitted in his Declaration in Opposition to the Motion for Summary Judgment that he was facing Ms. Belk as she sat in the driver seat when he "heard footsteps advance towards the vehicle [and that he] instinctively turned with [his] weapon beneath [his] chin to see who was approaching the passenger door of the vehicle."

After the shots were fired, Investigator Daniels "placed the BMW in park" by "open[ing] the door and plac[ing] [his] left foot

10    [LAGOA, J., Concurring in Part and in the Result]    18-12371

on the brakes, stopping the vehicle, as well as keeping the target at gun point." Investigator Wilson intended to handcuff Wade, but he did not because Investigator Daniels vocalized "that Wade was still moving and that the weapon was still in the car." Instead, Investigator Beach asked Investigator Daniels for his handcuffs, which he passed to her over the top of the vehicle. Investigator Daniels then kept Wade "at gunpoint until the shotgun was recovered from the target." Investigator Beach then "placed Mr. Wade in handcuffs and removed the shotgun from the" vehicle. Then, as Wade himself testified, he tried to resist Investigator Beach's actions by attempting to "remove her hands and sit up-right." Investigator Wilson instructed Investigator Wortham to request an ambulance. Investigator Beach asked for bandages, but Investigator Jones was only able to find a handful of napkins which Investigator Beach used to apply pressure to Wade's gunshot wound. At some point afterwards, Investigator Daniels was asked to step back from the BMW, Sergeant D. Brown took possession of Investigator Daniels's gun as evidence, and Investigator Daniels was escorted to and placed inside Investigator Freeman's vehicle as required by department policy.

Per the CAD Incident Report, "Shots Fired" was communicated at 2:07 p.m. and a request for EMS was also made at 2:07 p.m. Also per the CAD Incident Report, "Male Shot To The Head" was communicated at 2:08 p.m. EMS arrived on scene at 2:16 p.m., and EMS transported Wade to Grady Memorial Hospital at 2:39 p.m.

18-12371 [Lagoa, J., Concurring in Part and in the Result]    11

Ms. Belk was also transported by EMS to the DeKalb Medical Center.

### III.    Qualified Immunity

Here, all three defendants—Investigators Daniels, Jones, and Wilson—moved for summary judgment on the deliberate indifference claim based on qualified immunity. "The defense of qualified immunity completely protects government officials performing discretionary functions from suit in their individual capacities unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)); *accord Gilmore v. Hodges*, 738 F.3d 266, 272 (11th Cir. 2013) ("Qualified immunity protects government officials from liability for civil damages unless they violate a statutory or constitutional right that was clearly established at the time the alleged violation took place.").

In order to assert a qualified immunity defense, a government official must first show that "he was acting within his discretionary authority" during the alleged wrongdoing. *Glasscox*, 903 F.3d at 1213 (quoting *Skop v. City of Atlanta*, 485 F.3d 1130, 1136 (11th Cir. 2007)). Here, it is undisputed that the Investigators were acting within the scope of their discretionary authority. Once a government official makes this showing, the burden shifts to the plaintiff to show: (1) that the government official violated a constitutional right; and (2) that the law was clearly established at the time of the wrongdoing. *Pearson v. Callahan*, 555 U.S. 223, 232

(2009); *Terrell v. Smith*, 668 F.3d 1244, 1250 (11th Cir. 2012). A court may rest its analysis on either prong. *See Pearson*, 555 U.S. at 236.

Although qualified immunity protects all government officials aside from "the plainly incompetent" or those who "knowingly violat[e] federal law," it does not extend to government officials who knew or reasonably should have known that his or her actions would violate the plaintiff's constitutional rights. *Alcocer v. Mills*, 906 F.3d 944, 951 (11th Cir. 2018) (quoting *Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002)); *Jones v. Fransen*, 857 F.3d 843, 851 (11th Cir. 2017). In other words, "[u]nless a government agent's act is so obviously wrong, in the light of pre-existing law, that only a plainly incompetent officer or one who was knowingly violating the law would have done such a thing, the government actor has immunity from suit." *Youmans v. Gagnon*, 626 F.3d 557, 562 (11th Cir. 2010) (quoting *Lassiter v. Ala. A&M Univ., Bd. of Trs.*, 28 F.3d 1146, 1149 (11th Cir. 1994) (en banc)).

"Because [42 U.S.C.] § 1983 'requires proof of an affirmative causal connection between the official's acts or omissions and the alleged constitutional deprivation,' each defendant is entitled to an independent qualified-immunity analysis as it relates to his or her actions and omissions." *Alcocer*, 906 F.3d at 951 (citation omitted) (quoting *Zatler v. Wainwright*, 802 F.2d 397, 401 (11th Cir. 1986)). This Court's precedent instructs us to carefully "evaluate a given defendant's qualified immunity claim, considering only the actions and omissions in which that particular defendant engaged." *Id.*

18-12371 [LAGOA, J., Concurring in Part and in the Result]        13

Here, while the district court and the magistrate judge in its report and recommendation properly conducted that individualized analysis with respect to each defendant, the majority fails to conduct such an individualized analysis as to any defendant.

## IV.  Deliberate Indifference Claim Under the Fourteenth Amendment

Individuals detained by the government are guaranteed certain minimal protections by the Constitution.  The Fourteenth Amendment requires government officials to provide medical care to individuals who are injured during arrest.  *Valderrama v. Rousseau*, 780 F.3d 1108, 1116 (11th Cir. 2015).  This standard finds its roots in the Eighth Amendment's proscription of cruel and unusual punishment against prison inmates.  *See id.*  As we have noted, the Fourteenth Amendment's promise of due process provides a coextensive protection for pre-trial arrestees.  *Cottrell v. Caldwell*, 85 F.3d 1480, 1490 (11th Cir. 1996) (holding that "decisional law involving prison inmates applies equally to cases involving arrestees or pretrial detainees"); *see also Keith v. DeKalb County*, 749 F.3d 1034, 1044 n.35 (11th Cir. 2014) ("[T]he standard for providing basic human needs to those incarcerated or in detention is the same under both the Eighth and Fourteenth Amendments." (quoting *Marsh v. Butler County*, 268 F.3d 1014, 1024 n.5 (11th Cir. 2001) (en banc))).  Because the deliberate indifference analysis under the Eighth and Fourteenth Amendment are the same, cases discussing deliberate indifference are applicable as well in this analysis.  *See Cottrell*, 85 F.3d at 1490.

14      [LAGOA, J., Concurring in Part and in the Result]    18-12371

Wade's complaint raises a claim under 42 U.S.C. § 1983 and the Fourteenth Amendment, alleging that the Investigators were deliberately indifferent to his serious medical needs. When officials act with deliberate indifference to a pretrial detainee's serious medical needs, they violate the Fourteenth Amendment. *Valderrama*, 780 F.3d at 1116. To prevail on a deliberate indifference claim, a plaintiff must satisfy both an objective and a subjective inquiry. *See Swain v. Junior*, 961 F.3d 1276, 1285 (11th Cir. 2020). The objective inquiry requires a plaintiff to establish the existence of an objectively serious medical need. *See Goebert v. Lee County*, 510 F.3d 1312, 1326 (11th Cir. 2007). As to the objective inquiry, there is no dispute here as both parties agree that a gunshot wound is an objectively serious medical condition.

To satisfy the subjective inquiry, Wade must show "(1) subjective knowledge of a risk of serious harm; (2) disregard of that risk; (3) by conduct that is more than [gross] negligence." *Id.* at 1327 (alteration in original) (quoting *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005), *abrogated on other grounds by Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015)). Because it is undisputed that the Investigators had "subjective knowledge" of the risk, the subjective inquiry at issue here hinges on whether the Investigators "disregard[ed]" the risk "by conduct that is more than gross negligence." *Id.* (quoting *Bozeman*, 422 F.3d at 1272). This subjective inquiry requires Wade to prove that Investigators Daniels, Jones, and Wilson each were deliberatively indifferent, i.e., that each "acted with deliberate indifference to [Wade's] serious

18-12371 [LAGOA, J., Concurring in Part and in the Result]    15

medical need." *See id.* at 1326. The fact that medical care is eventually provided is insufficient, by itself, to defeat a claim for deliberate indifference, as an official may still act with deliberate indifference "by delaying the treatment of serious medical needs." *McElligott v. Foley*, 182 F.3d 1248, 1255 (11th Cir. 1999). But in making the determination of whether any particular delay is unconstitutional, the court must consider "the nature of the medical need and the reason for the delay." *Bozeman*, 422 F.3d at 1273 (quoting *Harris v. Coweta County*, 21 F.3d 388, 393–94 (11th Cir. 1994)). In addition, the plaintiff must present evidence from which a jury could infer more-than-grossly-negligent conduct to defeat an official's motion for summary judgment. *See McElligott*, 182 F.3d at 1255; *Bozeman*, 422 F.3d at 1272.

As noted above, a deliberate indifference claim contains a subjective component. Indeed, the word "deliberate" means "intentional," "premediated," or "fully considered." *Deliberate*, *Black's Law Dictionary* (11th ed. 2019). And "deliberate" as an adjective modifies the noun "indifference." In *Farmer v. Brennan*, 511 U.S. 825 (1994), the Supreme Court explained that a deliberate indifference claim focuses "on what a defendant's mental attitude actually was." *Id.* at 839. A plaintiff must therefore prove that the defendant acted with a "sufficiently culpable state of mind" that shows "subjective recklessness as used in the criminal law." *Id.* at 834, 839 (first quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). Because there is no dispute that the objective component was satisfied, Wade must show the existence of a genuine issue of material

16    [LAGOA, J., Concurring in Part and in the Result]    18-12371

fact on the subjective component in order to rebut the defense of qualified immunity. Wade, however, failed to present *any* evidence in the record establishing that Investigators Daniels, Jones, or Wilson possessed the requisite subjective intent for a deliberate indifference claim as to Wade's serious medical needs. Investigators Daniels, Jones, and Wilson are therefore entitled to judgment as a matter of law on Wade's deliberate indifference claim.

## V.    A Reasonable Jury Could Not Infer Deliberate Indifference as to the Medical Deprivation Claim Against Investigators Daniels, Jones, and Wilson

Although the majority affirms the district court's grant of qualified immunity to Investigators Daniels, Jones, and Wilson on Wade's medical deprivation claim on the basis that "there was no established law on how long before officers must request medical care for a suspect that has been shot to constitute deliberate indifference," it concludes that a jury could infer deliberate indifference on their part because the Investigators have not provided a reason for the four-minute delay in requesting an ambulance. *See* Maj. Op. at 13–16. The question presented in this case is simple: does the Constitution permit a less-than-four-minute delay between the time an armed fugitive is shot and the time an ambulance is called? The majority says it does not, concluding that a four-minute delay, coupled with a "failure to provide any explanation for that delay," is constitutionally infirm. Maj. Op. at 15. The majority rests its conclusion on four grounds: (1) that a jury could infer the Investigators waited a full four minutes before requesting medical

18-12371 [LAGOA, J., Concurring in Part and in the Result]    17

assistance; (2) that the Investigators provided no explanation for the delay; and (3) that a jury could infer the Investigators intentionally delayed medical treatment. I respectfully disagree not only with the majority's conclusion, but with each step the majority took to reach that conclusion.

Before addressing the inferences that the majority makes to conclude there was deliberate indifference on the part of the defendants, I first expound on why I believe Investigators Daniels, Jones, and Wilson did not violate clearly established constitutional law.

A. *No Clearly Established Law Existed Providing Fair*

*Warning*

Even if Wade could show that Investigators Daniels, Jones, and Wilson each acted with deliberate indifference to his serious medical needs—which, as addressed in the following sections, he cannot—qualified immunity applies because Wade failed to show that the defendants violated clearly established law. "'Clearly established' means that, at the time of the officer's conduct, the law was '"sufficiently clear" that every "reasonable official would understand that what he is doing"' is unlawful." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011)); *Reichle v. Howards*, 566 U.S. 658, 664 (2012) ("To be clearly established, a right must be sufficiently clear 'that every "reasonable official would [have understood] that what

18      [LAGOA, J., Concurring in Part and in the Result]    18-12371

he is doing violates that right.""" (alteration in original) (quoting *al-Kidd*, 563 U.S. at 741)).

Although Wade does not need to identify a case "directly on point, . . . existing precedent" must "place[] the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.  Indeed, a "plaintiff must establish more than broad legal truisms; he or she must demonstrate that the law fixed the contours of the right so clearly that a reasonable official would have understood his acts were unlawful." *Dolihite v. Maughon ex rel. Videon*, 74 F.3d 1027, 1040–41 (11th Cir. 1996).  That precedent must "define[ ] the contours of the right in question with a high degree of particularity." *Morgan v. Swanson*, 659 F.3d 359, 371–72 (5th Cir. 2011).  In order to answer this "salient question," we must ask whether the state of the law at the time of the incident "gave [the Investigators] fair warning that their alleged treatment of [Wade] was unconstitutional." *Hope*, 536 U.S. at 741.  Indeed, "[t]he *sine qua non* of the 'clearly-established inquiry' is 'fair warning.'" *Baynes v. Cleland*, 799 F.3d 600, 612–13 (6th Cir. 2015) (quoting *Hope*, 536 U.S. at 741).  The answer to the question of whether the law at the time of the incident gave the Investigators fair warning is a resounding no.

Wade has not identified any sufficiently analogous case that would have made it obvious that a clearly established right was violated, such that the Investigators had "fair warning" or were on notice that their actions constituted deliberate indifference to Wade's medical needs.  *See Youmans*, 626 F.3d at 563 (holding that a violation was not clearly established where no precedent made it

18-12371 [LAGOA, J., Concurring in Part and in the Result]    19

"obvious that the defendant's acts violated the plaintiff's rights in the specific set of circumstances at issue" in the case). As the Supreme Court has explained, qualified immunity is designed to "give[] government officials breathing room to make reasonable but mistaken judgments about open legal questions." *al-Kidd*, 563 U.S. at 743. "[T]he focus is on whether the [defendant] had fair notice that [his or] her conduct was unlawful." *Kisela v. Hughes*, 138 S. Ct. 1148, 1152 (2018) (per curiam) (quoting *Brosseau v. Haugen*, 543 U.S. 194, 198 (2004) (per curiam)). The qualified immunity defense thus protects "all but the plainly incompetent or those who knowingly violate the law." *Ziglar v. Abbasi*, 137 S. Ct. 1843, 1867 (2017) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)).

Because the focus of the analysis is on notice, the qualified immunity analysis "requires that the legal principle clearly prohibit the [defendant's] conduct in the particular circumstances before him." *Wesby*, 138 S. Ct. at 590. So, whether the defense "can be invoked turns on the 'objective legal reasonableness' of the official's acts." *Ziglar*, 137 S. Ct. at 1866 (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 819 (1982)). Because the inquiry into clearly established law is inherently *objective*—looking to whether an official's actions were *objectively* reasonable—the qualified immunity analysis remains *objective* even when the constitutional claim at issue involves *subjective* elements. *See Crawford-El v. Britton*, 523 U.S. 574, 588–89 (1998) ("[A]lthough evidence of improper motive is

20    [LAGOA, J., Concurring in Part and in the Result]    18-12371

irrelevant on the issue of qualified immunity, it may be an essential component of the plaintiff's affirmative case.").

It bears repeating that no case from the Supreme Court or this Court stands for, or even suggests, the proposition that when an armed fugitive is shot, but remains conscious, armed, and unrestrained with an innocent bystander in the car, the Constitution guarantees him a call for medical care within 240 seconds. While Wade raises this Court's decisions in *Valderrama* and *Bozeman* for this proposition, neither case does so. Indeed, even a cursory review of *Valderrama* and *Bozeman* shows that the officers' conduct at issue in both cases was intentional—i.e., more than grossly negligent—and thus wholly incongruous with the conduct at issue here.

In *Valderrama*, the record showed that after an officer shot the plaintiff in the genitals, instead of calling for an ambulance, the officer immediately began discussing with his co-officers "the need to concoct a story that would justify [his] use of deadly force." 780 F.3d at 1109, 1118. Then, in the moments after the shooting, the officer began searching the plaintiff's car "in violation of department policy" and offered "to drop the cocaine-possession charge against [one of the witnesses] to secure his cooperation." *Id.* at 1118. When the plaintiff then begged for an ambulance, the officer told him to sit down. *Id.* at 1117. Then, after three and a half minutes, the officers called for an ambulance but, when they did so, they misreported the gunshot wound as a simple laceration, which delayed medical treatment for *another* seven minutes. *See*

*id.* at 1117–18.  All in all, then, the officers intentionally delayed the plaintiff's medical treatment for over ten minutes.  *See id.* at 1120.

In addressing the plaintiff's claims, this Court in *Valderrama* explained that a plaintiff must present evidence that, among other things, *each* officer "disregarded the risk of serious harm" and such conduct "amounted to more than gross negligence" in order to show deliberate indifference to the plaintiff's serious medical need. *Id.* at 1116.  We also noted that "when officials 'ignore without explanation a[n arrestee's] serious [medical] condition that is known or obvious to them, the trier of fact may infer deliberate indifference.'"  *Id.* at 1122 (alteration in original) (quoting *Brown v. Hughes*, 894 F.2d 1533, 1538 (11th Cir. 1990)).  Applying those principles, this Court concluded that the officers' conduct amounted to more than gross negligence because they "delayed [the plaintiff's] medical care for more than ten minutes" while trying to fabricate evidence, concoct a corroborating story, and bribe a witness's compliance.  *See id.* at 1117–20.  Based on the undisputed record evidence regarding *each* officer's conduct, this Court held that a jury could find that the officers knowingly disregarded a serious risk of harm to the plaintiff.  *Id.* at 1119.

Our holding in *Valderrama* was thus based on the reasonable inference that the officers intentionally attempted to delay medical treatment and use that time for nefarious purposes—i.e., intentional conduct beyond gross negligence.  The holding was not based solely on the period of delay in making the initial call.  In fact, we were explicit in our repudiation of the notion that the short

22    [LAGOA, J., Concurring in Part and in the Result]    18-12371

delay before calling an ambulance, standing alone, would have been enough to escape summary judgment. Specifically, this Court held that:

> While a three and half minute delay standing alone may be insufficient to establish deliberate indifference, under the facts of this case, a reasonable jury could conclude that [the officers] were more than grossly negligent when they delayed Mr. Valderrama's medical care for more than ten minutes for no good or legitimate reason as he faced life-threatening injuries.

Id. at 1120; cf. Pourmoghani-Esfahani v. Gee, 625 F.3d 1313, 1318–19 (11th Cir. 2010) ("No preexisting law clearly establishe[s] that an approximately two-to-five-minute delay of medical care . . . is a constitutional violation . . . .").

The facts of this case do not bear even a passing resemblance to those of Valderrama. Here, there is no evidence in the record from which a jury could infer that any of the three defendants delayed medical treatment with deliberate indifference. Indeed, even Wade, who admits he was conscious throughout the entire time period, failed to identify a single action taken by any of the three Investigators after he was handcuffed and before the ambulance was called. By contrast, Valderrama is a case about officers intentionally delaying medical treatment for "more than ten minutes" in order to try and cover up their use of excessive force. See 780 F.3d at 1120. Valderrama thus has no application to this case and does not constitute clearly established law that put Investigators

18-12371 [Lagoa, J., Concurring in Part and in the Result]    23

Daniels, Jones, and Wilson on notice that their treatment of Wade was unconstitutional.

In *Bozeman*, the victim (a juvenile detainee) was sitting in his cell at a detention facility when four officers entered. 422 F.3d at 1268. A scuffle ensued, during which other inmates testified they heard "choking sounds" and someone "gagging for air," followed by the victim's silence. *Id.* at 1269. An inmate who was one of the members of the detention facility's custodial staff was outside the cell as this occurred and testified that, during the scuffle, the victim was lying "face-down on the bed" while the officers applied "weight to him," with one officer "pushing down on [the victim's] head." *Id.* The inmate also testified that even after the victim said "I give . . . I've had enough," the officers responded, "Oh, we don't think you've had enough," and continued to apply pressure to the victim. *Id.* At some point, the inmate heard "a sound like . . . the wind went out" of the victim, and when the officers carried him out of his cell, one officer was heard saying, "damn, damn, damn." *Id.*

The victim had lost consciousness due to the beating and suffocation he suffered at the hands of the prison guards. *Id.* at 1269–70. And for the next *fourteen minutes*, the officers dragged and carried his "lifeless" body, which "hung and flopped in an uncontrolled manner," around the detention facility. *Id.* at 1269. At one point, they laid him down on the ground to attempt to unlock a door, and another inmate could see from his own cell that the victim's ankles had turned blue and swollen from the lack of

24      [LAGOA, J., Concurring in Part and in the Result]    18-12371

oxygen. *See id.* at 1270.  After fourteen minutes had passed—during which every witness, other than the officers involved, testified that the victim was clearly unconscious—the officers reached their destination (in front of a solitary confinement cell) and claimed that only then did they notice that the victim had lost consciousness. *See id.*  Finally, they radioed for medical attention. *See id.*  After being transported to the hospital, the victim died; his autopsy listed "asphyxia" as the cause of death.  *Id.*

This Court noted that, viewed in the light most favorable to the plaintiff, the officers had become subjectively aware of his need for medical attention after the struggle, when they exited his cell. *See id.* at 1273.  Accordingly, we concluded that the prison guards "failed for fourteen minutes to check [his] condition, call for medical assistance, administer CPR or do anything else to help, [thereby] disregard[ing] the risk facing [the victim] in a way that exceeded gross negligence."  *Id.*  We noted that "[t]he tolerable length of delay in providing medical attention depends on the nature of the medical need and the reason for the delay," but that "the right reason for the delay can make a delay of any duration tolerable."  *Id.* (quoting *Harris*, 21 F.3d at 393–94).  Nonetheless, we concluded that the prison guards' fourteen-minute delay in calling for medical help was actionable because they "offer[ed] no explanation—medical or non-medical—for the failure to (1) check [the victim]'s breathing or pulse; (2) call for medical assistance; or (3) administer CPR themselves, during the fourteen minutes in question."  *Id.*  The prison guards therefore "ignore[d] without

18-12371 [LAGOA, J., Concurring in Part and in the Result]     25

explanation" the victim's serious medical needs because they "did nothing" for fourteen minutes and could not justify their inaction. *See id.* at 1273–74; *see also Brown*, 894 F.2d at 1536, 1538–39 (finding issue of fact as to deliberate indifference because of evidence suggesting that correctional officer ignored the plaintiff's broken foot, resulting in a six-hour delay of medical care).

As the facts of *Bozeman* illustrate, our holding there is not applicable here. Not only was the delay in *Bozeman* over three times longer than the delay at issue here, but the guards in *Bozeman* did not (and could not) provide any explanation for it. *See* 422 F.3d at 1273 ("We conclude, therefore, that because of the urgent nature of the medical need in this case and because of the (lack of any) reason for the corresponding delay in care, a delay of fourteen minutes is actionable under the constitution, given the circumstances here."). After all, the victim in *Bozeman* was not only unarmed—he was *unconscious*. And the guards presented no evidence of any reason for not immediately placing him down and calling for medical assistance. Here, by contrast, the officers had to separate the *conscious* victim from his sawed-off shotgun and restrain him before they could seek medical aid.

Significantly, neither *Valderrama* nor *Bozeman* clearly establish the alleged unconstitutionality of the officer's actions here. These two cases stand only for the rather unremarkable proposition that when an official intentionally and without legitimate reason delays medical treatment for a life-threatening medical condition that he was subjectively aware of for more than ten minutes,

26      [LAGOA, J., Concurring in Part and in the Result]    18-12371

his actions violate the constitution. *See Bozeman*, 422 F.3d at 1273 (noting that with the "urgent nature of the medical need . . . , a delay of fourteen minutes is actionable"); *Valderrama*, 780 F.3d at 1120 (noting that "a reasonable jury could conclude that [the officers] were more than grossly negligent when they delayed [the victim's] medical care for more than ten minutes for no good or legitimate reason as he faced life-threatening injuries").

Here, the record evidence—viewed in the light most favorable to Wade—shows that immediately after the shooting, while Wade was still moving and the shotgun was still in the car, Investigator Wilson instructed another officer to call for an ambulance. The record evidence further shows that then, Investigator Beach opened the passenger-side door, placed handcuffs on Wade, and removed the shotgun from the vehicle. Investigator Beach unsuccessfully sought a first aid kit and then applied pressure on Wade's gunshot wounds, attempting to stop the bleeding by using napkins that she received from Investigator Jones. Even if the first aid was rudimentary, it was rendered almost immediately after the shotgun was removed from the car and Wade was handcuffed. These facts are undisputed.

Wade must show—*as to each defendant*—that the defendant delayed medical treatment out of deliberate indifference. This he has not done. The record does not show that the Investigators "did nothing," like in *Bozeman*, or ignored requests for help and mischaracterized the injuries for improper purposes, like in *Valderrama*. Although Investigators Daniels, Jones, and Wilson did not

18-12371 [LAGOA, J., Concurring in Part and in the Result]    27

personally render medical aid to Wade, the record is devoid of any evidence suggesting that Investigators Daniels, Jones, or Wilson either hindered Investigator Beach from providing aid to Wade or hindered EMS from accessing Wade.  Instead, the record evidence shows that Investigator Jones went searching for bandages following Investigator Beach's request and brought Investigator Beach what he found—napkins as a substitute for bandages that she used to staunch Wade's bleeding.  The record evidence also shows that Investigator Wilson instructed Investigator Wortham to call for an ambulance.  Both of these actions occurred immediately following the shooting and before the call requesting EMS.  Finally, after Wade was secured, Investigator Daniels was escorted to and placed in a patrol car and was relieved of his weapon in conformance with department policy after an officer has shot an individual.

The uncontroverted evidence further establishes that—unlike in *Valderrama* where the officers intentionally misrepresented the plaintiff's injuries—dispatch was notified at 2:07 p.m. of "shots fired" and was notified at 2:08 p.m. of a "male shot to head."  Dispatch was also notified at 2:08 p.m. that officers were "blocking traffic" and "setting up perimeter to let EMS in."

"[Q]ualified immunity attaches unless it is 'already clearly established in such a particularized way to make obvious the conclusion for all reasonable, similarly situated . . . [officers] that what Defendants were doing violated [the arrestee's] federal rights under the circumstances.'"  *Burnette v. Taylor*, 533 F.3d 1325, 1332 n.7 (11th Cir. 2008) (alteration in original) (quoting *Bozeman*, 422

28    [LAGOA, J., Concurring in Part and in the Result]    18-12371

F.3d at 1270–71).  Because there is no clearly established law that placed Investigators Daniels, Jones, and Wilson on notice that their actions violated Wade's constitutional rights, they are entitled to qualified immunity on Wade's medical deprivation claim.

### 2. *No Reasonable Juror Could Infer that the Investigators Waited a Full Four Minutes Before Requesting Medical Assistance.*

I part ways, however, with the majority's conclusion that there was a four-minute delay between the shooting and the time the ambulance was called, as a *de novo* review of the record evidence does not support this determination.  Wade presented no evidence that the shooting occurred exactly at 2:03 p.m.  Instead, Wade and the majority rely on a statement from Investigator Wilson, who stated that "at *approximately* 1403 [or 2:03 p.m.], [the officers] noticed that the subject (Nicholas Wade) had a shotgun in the car with him and he pointed the weapon."  (emphasis added).  The key word here is "approximately"—which means in a manner "very near," "closely situated," or "nearly resembling."  *Approximate*, *Oxford English Dictionary* (3d ed.).  The majority and Wade base their computation on a statement by one defendant based on an approximation.  Viewing this in the light most favorable to Wade, this statement demonstrates *only* that the four-minute period in question was between the time when the Investigators first realized that Wade was armed with a sawed-off shotgun and the time when the ambulance was called.  Nothing in this statement suggests that the shots were fired exactly at 2:03 p.m.  The four

18-12371 [LAGOA, J., Concurring in Part and in the Result]    29

minutes do not, in other words, refer to the time period between when the officers were aware of Wade's need for medical attention and when the ambulance was called.

Moreover, while Wade and the majority rely on the notation in the CAD report that establishes that EMS was called at 2:07 p.m., they completely disregard the notation immediately below that line that states "shots fired" at 14:07 (2:07 p.m.). Thus, the *only* evidence in the record of an *exact time* when shots were fired establishes that they were fired at 2:07 p.m.

3. *No Reasonable Juror Could Infer that the Investigators Provided "No Explanation" for the Delay in Medical Treatment*

I also disagree with the majority's conclusion that a reasonable juror could infer that the officers provided "no explanation" for the delay in medical treatment. *See Brown*, 894 F.2d at 1538 (noting that officials may not "ignore without explanation a prisoner's serious medical condition that is known or obvious to them"). Even if we assume that the shooting did occur exactly at 2:03 p.m., and further infer that the Investigators became aware of Wade's need for medical attention also exactly at 2:03 p.m., the undisputed record evidence shows that the delay in calling for an ambulance was justified and does not rise to deliberate indifference.

This is because—even assuming the shooting happened exactly at 2:03 p.m.—in the moments immediately following the shooting, Wade remained conscious and in possession of a sawed-off shotgun. In addition, the car that Wade was in began moving,

30    [LAGOA, J., Concurring in Part and in the Result]    18-12371

as the driver of the vehicle, Ms. Belk, apparently went into shock. Therefore, before seeking medical attention, Investigators Daniels, Jones, and Wilson had to secure the situation. Investigator Daniels opened the door of the vehicle, stopped its movement, and placed it in park. Ms. Belk ran out of the vehicle. Investigator Beach opened the passenger door, disengaged Wade from his shotgun, placed Wade in handcuffs, and assessed the severity of Wade's injuries. These facts—viewed in the light most favorable to Wade as the plaintiff—constitute the "justification" for the delay in seeking medical treatment for Wade.

The majority, however, suggests that the Investigators' decision to secure the safety of themselves, Wade, and Ms. Belk—the driver of the vehicle and the mother of the child Wade had murdered earlier—and to separate Wade from his sawed-off shotgun and place him in handcuffs is insufficient to even qualify as an explanation for the delay. I strongly disagree with the majority's conclusion. The record shows and establishes that all three Investigators have, in fact, provided an explanation for the delay in medical treatment. Their explanation is constitutionally sufficient and more than justified the brief delay occasioned before calling for an ambulance.

Turning to the majority's statement that the "investigators provide no justification for why it took *eleven* investigators *four minutes* to call an ambulance when Beach had searched, handcuffed, and restrained Wade," Maj. Op. at 15 (emphasis in original), there are three problems with it. First, the deliberate indifference

18-12371 [LAGOA, J., Concurring in Part and in the Result]    31

claim is brought against only *three* investigators—Investigators Daniels, Jones, and Wilson.  Accordingly, the question of why other investigators at the scene purportedly delayed calling an ambulance is irrelevant to the deliberate indifference claim at issue against these three Defendants.  This Court's precedent on a claim of deliberate indifference is clear—"each individual [d]efendant must be judged separately and on the basis of what that person knows."  *Burnette*, 533 F.3d at 1331.  "[I]mputed or collective knowledge cannot serve as the basis for a claim of deliberate indifference."  *Id.*

Second, even if the clock started to run at exactly 2:03 p.m., Investigator Beach searched, handcuffed, and restrained Wade *after* the clock started at 2:03 p.m.  Thus, even when viewed in the light most favorable to Wade, Beach's actions took place *after* the shooting and after 2:03 p.m.  Viewing the evidence in the light most favorable to Wade, the four-minute time period in question was between when the Investigators first realized that Wade was armed with a sawed-off shotgun and when the ambulance was called.  In other words, the four minutes do not refer to the time period between *when the Investigators were aware of Wade's need for medical attention* and *when the ambulance was called*.

Third, and in response to the majority's statement that there was no justification for why it took eleven investigators four minutes to call the ambulance, Maj. Op. at 15, because our review is *de novo*, it is not a mystery what the other investigators were

32    [LAGOA, J., Concurring in Part and in the Result]    18-12371

doing at the scene following the shooting. The record evidence establishes the following.

Investigator Beach, as already outlined, removed the shotgun from the vehicle, handcuffed Wade, and administered first aid to him. Investigator C. Robinson, after hearing the shots, waited until the scene was safe, moved his vehicle to prevent any traffic from coming into the area, placed crime scene tape at the scene, and then was told to report to the hospital to receive statements from Ms. Belk and Ms. Stevenson.

After Sergeant D. Brown heard the shots, he moved from cover, and, once Wade was handcuffed, checked Wade's pulse for responsiveness. Sergeant Brown then radioed that shots were fired and requested EMS. Sergeant Brown also took possession of Investigator Daniel's weapon to secure it as evidence after Daniels informed him that he shot Wade. Brown secured the weapon in the trunk of his car until he relinquished it to a DeKalb County Police CID Detective. Daniels was then escorted to and placed inside Investigator Freeman's vehicle as required by department policy.

Investigator A. Bell, after the shooting, approached the BMW, observed Wade bleeding from his head, radioed for EMS, and then secured the crime scene with crime scene tape. Deputy McRae and his K-9, Viper, stood by Wade until EMS arrived.

Investigator T. Wortham, after the shots were fired, assisted Ms. Belk and her sister away from the scene and requested EMS. Investigator N. Mendez after the shooting likewise called in

18-12371 [LAGOA, J., Concurring in Part and in the Result]        33

to have EMS enroute and assisted in securing the scene with crime tape.  Investigator Mendez was also instructed to accompany Wade via EMS to the hospital.

Thus, the record shows that the other officers were securing the scene, taking care of the witnesses, calling EMS for both Wade and one of the two females, monitoring Wade until EMS arrived, securing Daniels's weapon as evidence, and placing Daniels in a patrol car.

4. *No Reasonable Juror Could Infer that the Investigators*

*Intentionally Delayed Medical Treatment*

Finally, and for largely the same reasons, I disagree with the majority's conclusion that a reasonable juror could infer that the three officers intentionally delayed seeking medical treatment for Wade.  *See Brown*, 894 F.2d at 1538 (noting that an "intentional denial or delay of medical care is evidence of deliberate indifference").  As support for this position, the majority cites the aforementioned "four-minute" delay in requesting emergency medical care—as well as the extra one minute it took to identify the specific type of injury Wade suffered—and Wade's recollection that Investigator Daniels stated—at some unidentified time *before* Wade had been placed in handcuffs—that "[he] shot that motherfucker in the head" and that "motherfucker will die any minute."  Because of Investigator Daniels's statements, the majority suggests "a reasonable jury could infer that the investigators intentionally delayed

34    [Lagoa, J., Concurring in Part and in the Result]    18-12371

seeking medical attention to see if Wade would die of his injuries."
Maj. Op. at 15.

There are at least two things wrong with the majority's rea-
soning. First, the statements are attributed *only* to Investigator
Daniels, and thus say nothing of whether Investigators Jones or
Wilson (the other defendants) were deliberately indifferent to
Wade's need for medical assistance. *See Alcocer*, 906 F.3d at 951–
52 (remanding a § 1983 case for the district court to conduct indi-
vidualized analyses as to each officer, i.e., by parsing the actions
each officer undertook and omitted, on the one hand, and the ac-
tions others engaged in without each officer's knowledge or partic-
ipation); *Jackson v. West*, 787 F.3d 1345, 1354–56 (11th Cir. 2015)
(explaining that, as to the individualized assessment requirement,
"[b]ecause we must consider each officer individually, we analyze
what each officer knew about [plaintiff's] risk for suicide at the time
of his death [and] conclude that none of the seven officers appeal-
ing the District Court's order had subjective knowledge of a strong
risk that [plaintiff] would attempt suicide, and that none of the
seven officers were deliberately indifferent for qualified immunity
purposes," i.e., by delineating not only what each defendant did
and did not do, but also what each *knew* at the time of the inci-
dent).

Indeed, these statements do not refute that, immediately af-
ter the shooting, Investigator Wilson asked another officer to call
for an ambulance and that Investigator Jones searched for and re-
turned with napkins to help Investigator Beach began rendering

18-12371 [Lagoa, J., Concurring in Part and in the Result]    35

medical care to Wade. As such, even if Investigator Daniels expected Wade to die from his gunshot wounds, his statements do not suggest that *each of the other two defendants*—Wilson and Jones—ignored Wade's medical needs or wanted Wade to die or suffer, which is what Wade must show.

Second, these two statements do not support an inference that Investigator Daniels himself sought to delay medical care. The uncontroverted evidence shows that, following the shooting, Investigator Daniels remained with his gun pointed at Wade as Wade was moving and the shotgun was still in the car. Investigator Daniels kept his gun pointed at Wade while Investigator Beach removed the shotgun from the car, handcuffed Wade, and rendered first aid to Wade. Even Wade admits that Investigator Daniels made these statements while "Inv. Spears[4] was placing resistance [handcuffs] on my hands." Moreover, the undisputed record evidence shows that Investigator Daniels was present when Investigator Wilson asked Investigator Wortham to request medical assistance, and nothing in the record suggests that Investigator Daniels hindered or attempted to stop the request for medical assistance. The undisputed evidence also does not show that Investigator Daniels attempted to stop or otherwise hinder Investigator Beach from

---

[4] As the record evidence establishes—and Wade concedes on appeal—Investigator Spears was not at the scene at the time of the shooting or immediately thereafter. The record establishes that Investigator Spears received a call at approximately 2:15 p.m. and arrived at the scene at approximately 2:30 p.m. to conduct witness interviews.

36    [LAGOA, J., Concurring in Part and in the Result]    18-12371

providing Wade with basic first aid. Additionally, the undisputed record shows that other officers asked Investigator Daniels to step away from the BMW, took possession of Investigator Daniels' gun as evidence, and placed him inside Investigator Freeman's vehicle as was required by department policy.

While it remains our duty to give the plaintiff the benefit of all *reasonable* inferences drawn from the evidence, a plaintiff does not reap the benefit of unreasonable inferences or of nonexistent evidence. And the inferential leap required to conclude, as the majority does, that a descriptive statement or statements made by one officer are probative of whether he or other officers wanted to "see if Wade would die of his injuries" is not reasonable. Deliberate indifference, as understood by its plain meaning, cannot and does not allow for any reasonable inference to be made by a jury that Investigators Daniels, Jones, or Wilson were deliberately indifferent to Wade's medical needs.

* * * *

In sum, while I agree with the majority that the Investigators' actions did not violate any clearly established law such that they are entitled to qualified immunity, I disagree with the majority's conclusion that a reasonable jury could conclude that Investigators Daniels, Jones, and Wilson acted with deliberate indifference. Specifically, Wade failed to present *any* evidence from which an inference could be drawn that the Investigators' conduct exceeded the standard of gross negligence. Indeed, the record evidence shows that the Investigators amply detailed what occurred

18-12371 [LAGOA, J., Concurring in Part and in the Result]    37

from the moment they saw Wade at 2:03 p.m. in the parking lot of the New Birth Missionary Baptist Church to the moment EMS was called. First, the Investigators approached the vehicle Wade was in. Investigator Daniels observed Wade, in the vehicle, first place a sawed-off shotgun to his chin before turning the shotgun in the direction of Investigator Jones. Then, the shooting occurred. Investigator Daniels, after noticing the vehicle was moving, stopped the moving vehicle and placed the car in park. Investigator Beach opened the passenger side door, secured the shotgun, handcuffed Wade, assessed Wade's injuries, asked for bandages, received napkins from Jones, and proceeded to provide first aid to stop Wade's bleeding. And Investigator Wilson instructed Investigator Wortham to call an ambulance.

Furthermore, I respectfully disagree with the majority's failure to limit its holding to the facts of this case. The majority's reasoning suggests that *any* period of delay between a shooting and an emergency call will be sufficient to reach a jury. But, as we have previously noted, these "cases are highly fact-specific and involve an array of circumstances pertinent to just what kind of notice is imputed to a government official and to the constitutional adequacy of what was done to help and when." *Bozeman*, 422 F.3d at 1274. Indeed, "[m]ost cases in which deliberate indifference is asserted are far from obvious violations of the Constitution." *Id.* In this case—when viewing the facts in the light most favorable to the plaintiff and even accepting the contention that shots were fired at 2:03—medical assistance was requested within four minutes (faster

38    [LAGOA, J., Concurring in Part and in the Result]    18-12371

than any case cited by the majority) for a victim who was armed and dangerous in the moments after the injury was sustained (a fact also absent from any case cited by the majority). Moreover, during that four-minute window, first aid was also administered to Wade. If this first aid by Officer Beach was not enough, how many more officers needed to provide medical assistance?

Here, a jury could not reasonably infer that any of the Investigators exhibited deliberate indifference, as understood by its plain meaning, to Wade's medical needs. If the facts here are enough to reach a jury, then every case with a life-threatening injury will be, regardless of the cause for delay.

## VI.    Conclusion

Based on the foregoing, I concur only in the result of the majority's affirmance of Wade's medical deprivation claim against Investigators Daniels, Jones, and Wilson. For the reasons stated, I respectfully disagree with the majority's determination that a reasonable jury could conclude Investigators Daniels, Jones, and Wilson acted with deliberate indifference. Additionally, I concur only in the result as to Wade's excessive force claim against Investigator Daniels. While the majority reaches the conclusion that Investigator Daniels is entitled to qualified immunity for his actions based on a determination that Investigator Daniels did not violate clearly established rights, I would instead affirm the grant of qualified immunity by holding that Investigator Daniels' use of force was not excessive under the facts of this case, which involved an armed and dangerous fugitive.

18-12371 [Lᴀɢᴏᴀ, J., Concurring in Part and in the Result]        39

I concur in full, however, in the majority's decision to reverse the district court's order granting Investigator Jones qualified immunity on Wade's excessive use of force claim and in the majority's decision to affirm the district court's order denying Wade's motion for leave to add Investigator Beach as a defendant.